# *EXHIBIT I*

# *THIRD INVESTMENT CONTRACT*

| | |
|---|---|
| Contract Number | *120983* |
| Client Name | *Bernard M Eisen* |

# VENULUM LTD.

### FINE WINE MASTER PURCHASE AGREEMENT

DATED AS OF *Oct 3, 2013*

Venulum Ltd., a British Virgin Islands Business Company whose principal address is located at P.O. Box 765, 4th Floor Rodus Building, Road Town Tortola, BVI (the "Company") and *Bernard M Eisen* whose principal address is set forth herein (the "Contractholder") have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Fine Wine Master Purchase Agreement (the "Master Contract"), which includes all exhibits attached to this Master Contract, and all purchase confirmations, sale confirmations and other documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming the agreement of the parties to the relevant terms of each such Transaction. All Transactions are entered into in reliance on the fact that this Master Contract and all Confirmations form a single agreement between the parties (collectively referred to as the "Contract"), and the parties would not otherwise enter into any Transactions.

Prospective Contractholders should read the Confidential Offering Memorandum for the Contracts, as the same may be supplemented, amended or restated from time to time (the "Memorandum") as well as this Master Contract (including all exhibits thereto) and the initial Confirmation attached hereto (including the exhibit thereto) prior to entering into this Master Contract. In the event of any inconsistency between the provisions of any Confirmation and this Master Contract (including the Exhibits attached hereto), the provisions of such Confirmation will prevail for the purpose of the relevant Transaction.

**WHEREAS,** the Company is in the business of dealing in fine wine and champagne; and

**WHEREAS,** the Contractholder from time to time may wish to acquire fine wines or champagne from the Company through the Contract and either take delivery of such fine wines or champagne or have the Company sell such fine wines or champagne on its behalf; and

**WHEREAS,** the Contractholder and the Company wish to establish and agree upon certain terms and conditions that will apply to any such Transaction between the Contractholder and the Company;

**NOW THEREFORE,** the Contractholder and the Company hereby agree as follows:

1. **DEFINED TERMS.** In the Contract, the following words shall have the meanings shown below:

   **Account Manager:** means CFW Management Ltd.

   **Account Representative:** means any employee or representative of the Account Manager who is appointed to a Contractholder to assist with the purchase of Wine and is the personal relationship manager for the Contractholder.

   **Affiliate:** means any person that directly or indirectly controls, or is controlled by, or is under common control with the Company or the Account Manager. The term "control" as used herein

(including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power (i) to vote or dispose of, or direct the voting or disposition of, fifty percent (50%) or more of the outstanding voting securities of such person or the Company or the Account Manager or (ii) otherwise to direct the management or policies of such person or the Company or the Account Manager by contract or otherwise.

**Company:** has the meaning set forth in the preamble above.

**Confirmation:** has the meaning set forth in the preamble above, and sample Confirmation is attached to this Master Contract as Exhibit B.

**Contract:** has the meaning set forth in the preamble above.

**Contractholder:** has the meaning set forth in the preamble above.

**Contractholder Information:** means any information identifying the Contractholder (such as name, social security number, taxpayer identification number credit card number, email address and telephone number) that is contained in the Contractholder Questionnaire or otherwise provided by the Contractholder to the Company, the Account Manager or any Affiliate.

**Contractholder Questionnaire:** means the questionnaire, attached to this Master Contract as Exhibit A, to be completed by the Contractholder and returned to the Company.

**Delivery of Parcel:** means, with respect to a particular Parcel, the delivery of the Parcel ex Cellars or ex Storage Location within a commercially reasonable time after the applicable Holding Period with respect to such Parcel has expired (or such earlier time if requested by the Contractholder).

**Delivery Election:** has the meaning set forth in Section 3.4.

**Delivery Notice:** has the meaning set forth in Section 3.8.

**Deposit:** has the meaning set forth in Section 2.4.

**Election Date:** has the meaning set forth in Section 3.4.

**Ex Cellars:** means "at the door" of the cellars, or a Parcel held in or at the cellars of the maker or producer at the Election Date.

**Ex Storage Location:** means at the Storage Location, "in bond" if applicable.

**Holding Period:** has the meaning set forth in Section 2.1.

**Management Fee:** has the meaning set forth in Section 4.2.

**Master Contract:** has the meaning set forth in the preamble above.

**Net Gain:** means, with respect to any particular Transaction, the excess of (i) the gross proceeds received by the Company upon the sale of the Parcel underlying such Transaction over (ii) the Purchase Price with respect to such Transaction.

**Net Proceeds:** means, with respect to any particular Transaction, the excess of (i) the gross proceeds received by the Company upon the sale of the Parcel underlying such Transaction over (ii) the aggregate Management Fees payable with respect to such Transaction.

**Non-Disclosure Agreement:** has the meaning set forth in Section 5.3.

to the acceptance by the Company of any amounts to be paid by any person with respect to a Transaction.

      **2.3**    **Purchase Terms.** The terms with respect to each Transaction, including the Purchase Date, Purchase Price with respect to such Transaction, the amount of any Deposit and Installments required by such Transaction, the Payment Date with respect to such Transaction, the dates on which the Deposit and Instalments must be made, and the Holding Period for such Transaction, shall be set forth in the Confirmation with respect to such Transaction.

      **2.4**    **Payment of Purchase Price.** Each Contractholder will be required to make an initial deposit towards the Purchase Price of a Transaction (the "Deposit") in an amount determined by the Company and will have an unpaid balance remaining on the total amount of the Transaction. The Contractholders shall be required to pay off the balance of the Purchase Price of a Transaction in periodic payments as set forth in the Confirmation or at such time as otherwise agreed to in writing by the Company and the Contractholder (each an "Installment"). A Contractholder may elect to pay the Transaction in full upon entering into the Transaction or at such other time for a reduction in the applicable Purchase Price for the Transaction, in such amount and time as determined by the Company in its sole discretion.

3.     TITLE PASSAGE, MARKETING OF WINE, DELIVERY OF PARCEL & RISK OF LOSS.

      **3.1**    **Title Passage.** The Company shall retain title to the Wines underlying a Transaction until the Contractholder makes all applicable Installments required by the Confirmation with respect to such Transaction or otherwise pays the Purchase Price for such Transaction in full. Once a Contractholder completes making all required Installments required by a Transaction and the Purchase Price with respect to the Transaction is paid in full, the Contractholder shall be granted title to the Wine underlying such Transaction. Within a reasonable time, the Company shall provide the Contractholder with a certificate of ownership with respect to such Parcel, setting forth the Storage Location and rotation number with respect to such Parcel.

      **3.2**    **Marketing of Wine.** Once title to Wine passes to a Contractholder, the Contractholder may make a Delivery Election or, alternatively, if such Delivery Election is not made, the Company will market and may sell such Wine on the Contractholder's behalf over a period of time, which shall be within six (6) months of the date title of the Wine passed to the Contractholder, subject to the Company's sole discretion to extend such period ("Marketing Period"). The Company will make commercially reasonable efforts to market the Wine to parties unaffiliated with the Company, which may be parties who sell Wine on a wholesale or retail basis, to maximize the value to be obtained for such Parcel. The unaffiliated parties, the Company or its Affiliates may make offers to the Contractholder to purchase all or part of the Wine, and such offers will be conveyed to the Contractholder. Any sale of Wine will only occur with the prior written approval of the Contractholder. Upon the sale of the Wine underlying a Transaction, the Company shall pay to the Contractholder the Net Proceeds from such sale within twenty eight (28) days of the completion of such sale, unless payment for the Wine subject to the sale is upon delivery of the Wine to the purchaser or otherwise agreed to in writing, and a Confirmation of the sale will be provided to the Contractholder. The Contractholder can elect to apply the Net Proceeds towards another Transaction or as otherwise agreed to by the Contractholder. The Contractholder agrees that any such Net Proceeds of the Contractholder held by the Company for the Contractholder will not accrue any interest unless otherwise specifically agreed in writing by the Company.

      **3.3**    **Storage.** Notwithstanding anything to the contrary set forth in the Contract, the Company has the right to store Wine in any government regulated bonded warehouse or other location which it reasonably believes is suitable for the storage of Wine, in its sole discretion, until a Delivery Election is made with respect to such Parcel.

      **3.4**    **Delivery Election.** Except as otherwise provided herein, once the Holding Period with respect to such Parcel has expired, the Contractholder may elect (a "Delivery Election") to take Delivery of Parcel by written notice to the Company within 30 days of the expiration of the Holding

**Parcel:** means the aggregate quantity of each particular Wine purchased or that will be purchased on behalf of a Contractholder in a Transaction pursuant to the relevant Confirmation, as set forth in such Confirmation.

**Payment Date:** means, with respect to a particular Transaction, the date the Purchase Price with respect to such Transaction is to be made in full, as set forth in the relevant Transaction.

**Purchase Price:** means the full purchase price for a Transaction, as set forth in the relevant Confirmation, excluding (i) the cost of shipping the Parcel to the place of Delivery of Parcel, (ii) the costs of packaging or bond handling or the payment of customs duties or taxes with respect to such Transaction and (iii) any legal fees and other expenses of the Contractholder, if any, incurred in connection with any aspect of the Contract.

**Storage Location:** means the government regulated bonded warehouses, which may be owned by persons which are affiliated with the Company, where the Wine contained in a Parcel is stored during the Holding Period relating to such Parcel and is located on the Election Date with respect to such Parcel.

**Transaction:** has the meaning set forth in the preamble above.

**Wine:** means collectively fine wine, port, fortified wine, champagne, new fine wine in the bottle and when sold "en-primeur" (which is a method of purchasing wines early while a vintage is still in the barrel), before and after its commercial release and in other fine wines that the Company in its sole discretion may decide to offer to Contractholders through entering into the Contracts.

## 2.   DETERMINATION OF PARCEL; METHOD OF SUBSCRIPTION; PURCHASE TERMS.

**2.1   Wine Selection.** The Contractholder shall discuss with its Account Representative the Wines available for purchase through the Contract and the recommended Holding Period for such Wines in the Storage Location prior to the purchase of such Wines, and, based on such discussions, the Contractholder shall instruct the Company which Wines it has determined to purchase and the agreed to Holding Period for such Wines (the "Holding Period"). Based on the Contractholder's selections, the Company will prepare and send to the Contractholder a Confirmation with respect to such Transaction, setting forth in reasonable detail a description of each Wine, the price and quantity to be purchased and the Holding Period for such Wine. The Company shall have the right, in its sole discretion, to substitute or replace a Wine underlying a Transaction, as set forth in the Confirmation with respect to such Transaction, with a Wine from the same region and that a Master of Wine reasonably determines is of economically equivalent or greater value as the original Wine underlying such Transaction.

**2.2   Method of Subscription.** Transactions may be entered into on the first Business Day (as defined herein) of each calendar month, or on any other day approved by the Company's Board (as defined herein) in its sole discretion (each a "Purchase Date"). The term "Business Day" refers to any day when commercial banks in the United States and the banks in the British Virgin Islands are open for business (other than a Saturday or Sunday). The Purchase Price with respect to a Transaction may be paid in cash in U.S. dollars, or in exchange for the Net Proceeds from another Transaction or cases of Wine assigned a value and agreed to by the Company in its sole discretion. An executed Master Contract and Contractholder Questionnaire must be received by the Company prior to entering into any Transaction by a Contractholder. An executed Confirmation with respect to a Transaction and cleared funds in the amount of the applicable Deposit for such Transaction must be received by the Company at least one (1) Business Day prior to the Purchase Date on which a prospective Contractholder wishes to enter into such Transaction.

The Company reserves the right to accept or reject any purchase Transaction pursuant to the Contracts in its sole discretion for any reason whatsoever and to withdraw any offer at any time prior

Period with respect to such Parcel (the "Election Date").  If the Contractholder makes a Delivery Election with respect to a Parcel, the Company shall not release such Parcel to the Contractholder until the Contractholder pays all Management Fees accrued and payable with respect to the relevant Transaction pursuant to Section 4.2 hereof.  Upon making a Delivery Election, the Contractholder must arrange for shipment of the Parcel from the Storage Location of such Parcel, obtain all required approvals or permits for the delivery of such Parcel and be responsible for, and arrange to pay, any applicable sales taxes and duty fees payable in any jurisdiction in which the Parcel is shipped. Delivery of such Parcel shall be ex Cellars, except that delivery in the case of Wine held by the Company at a Storage Location shall be ex Storage Location.

      **3.5**    **Verification of Merchantability.** If the Contractholder makes a Delivery Election, the Contractholder shall be solely liable for verifying the merchantability and fitness of the Contractholder's Parcel, and the conformity of such Parcel with its description in relevant Confirmation. The Contractholder may request, within 10 days of Delivery of Parcel, a condition report from the Storage Location where such Parcel was stored.  If such condition report is unsatisfactory to the Contractholder, the Contractholder shall, within 10 days of receipt of such condition report, give written notice to the producer or the Storage Location of the Parcel and to the Company of any claim of defect in the Parcel based on the contents of the condition report. The Company, on behalf of the Contractholder, shall attempt to resolve the Contractholder's claim, if the claim is timely received by the Company.  The Company shall be released from any obligation to assist the Contractholder if the Contractholder fails to give notice to the Company as required in this Section 3.5.

      **3.6**    **Compliance with Local Law.** The Contractholder shall ensure that any further delivery, distribution, sale or transaction involving the Parcel subsequent to Delivery of Parcel shall comply in all respects with any conditions and restrictions imposed by applicable law and/or the producer of the Wine or the storage company for the Parcel. The Contractholder acknowledges and understands that many jurisdictions have enacted laws to regulate the shipment and sale of alcoholic beverages purchased outside of that jurisdiction.  Some statutes make such shipments and sales a crime unless a permit or license is obtained.  As these laws may affect the Contractholder's purchase from the Company, the Contractholder should investigate the laws that are applicable to the Contractholder before shipping or arranging to ship any Parcel from the place of delivery.  The Contractholder, and not the Company, is the owner and shipper of each Parcel purchased at the place of Delivery of Parcel. Accordingly, if the Contractholder makes a Delivery Election with respect to a Parcel, then the Contractholder shall be responsible for and bears all expense and risks associated with the Parcel, including packaging, customs duties, taxes, selecting a carrier and providing delivery instructions. The Contractholder shall be fully responsible for complying with all applicable foreign and U.S. federal, state and local laws, rules and regulations (collectively, "Applicable Laws"), and the Company shall not be responsible for assuring compliance with Applicable Laws, obtaining licenses or otherwise giving advice on the carriage of goods, and the Company and the Affiliates shall not be responsible for interpreting any Applicable Laws that may affect the Contractholder's shipment. The Company may comply with instructions and requests from applicable law enforcement agencies or other governmental authorities, regardless of whether such instructions are inconsistent or contrary to any Applicable Laws.

      **3.7**    **Risk of Loss.** The Contractholder shall assume the risk of damage or loss of a Parcel upon Delivery of Parcel to the Contractholder.  After Delivery of Parcel, it shall be the responsibility of the Contractholder to arrange for any insurance of the Parcel.  Moreover, the Company shall not be liable to the Contractholder for any losses suffered by the Contractholder on the sale of a Parcel or for any claims by the Contractholder that the Company has failed to obtain the best Purchase Price for a Parcel.  The Contractholder acknowledges and agrees that the Company, the Account Manager, Account Representative, the Management Company and their respective principals, agents or employees have not made any covenants, promises, agreements, representations, inducements, conditions or other understandings, either written or oral, to the Contractholder with respect to the potential price for which any Parcel may be sold at any time.

3.8     **Assumption of Costs.** If the Contractholder does not make a Delivery Election or accept any offer to purchase Wine during the Marketing Period, the Company may give notice to the Contractholder to take physical delivery of the Wine ("Delivery Notice"), and the Company will immediately begin to invoice the Contractholder for the storage costs, fees, insurance expense and any other expense associated with the Wine that accrues from the date of the Delivery Notice. The Contractholder will remit payment to the Company within 15 days of the date appearing on the invoices. If the Contractholder fails to pay an invoice, the Company shall have the right to sell the Wine to any affiliated or unaffiliated person at a price that the Company determines in its sole discretion to be commercially reasonable, and the Net Proceeds will be remitted to the Contractholder as provided for in Section 3.2, above. Moreover, the Contractholder assumes the Risk of Loss for any sale under this Section as stated in Section 3.7, above.

3.9     **Rights of Company upon Contractholder's Failure to Respond.** If, after the title to a Parcel passes to the Contractholder and the Holding Period with respect to such Parcel has expired, the Company fails in at least three (3) attempts to contact the Contractholder regarding the sale of such Parcel using the Contractholder Information, the Company shall have the right to sell such Parcel pursuant to Sections 3.2 and 3.8 hereof without the Contractholder's consent; provided, however, that the Company shall obtain at least three (3) written offers for such Parcel from unaffiliated parties prior to the sale.

3.10     **Wine Substitutions.** Prior to the expiration of the Holding Period with respect to a Transaction, the Contractholder may request to sell or exchange the Wine underlying such Transaction with new Wine. Upon such a request, the Company may in its sole discretion sell such Wine pursuant to the procedures outline in Section 3.2 herein and credit the Net Proceeds from such sale towards the Purchase Price of the new Transaction. Alternatively, if agreed to by the Company and the Contractholder, such Wine will not be sold, but the value of such Wine will be credited towards the Purchase Price of the new Transaction

3.11     **Assignee Clause.** If the Contractholder shall (i) be determined or adjudged incompetent or otherwise incapacitated by a court of competent jurisdiction, (ii) die, dissolve or, for any reason, cease to be in existence, or (iii) merge or consolidate, or if there is a change in the direct or indirect beneficial ownership of the Contractholder, the Contractholder's estate or other assignee or legal representative shall succeed as assignee to the Contractholder's interest in the Contract and shall otherwise be bound by the terms and conditions of the Contract.

3.12     **Transfers.** Except as otherwise provided in Section 3.11 hereof, the Contractholder may not transfer its rights under the Contracts without the prior written consent of the Company.

4.   FEES AND EXPENSES.

4.1     **Purchase Price Mark-up.** The Purchase Price for a Transaction paid by a Contractholder may include a mark-up over the price secured by the Company to purchase the applicable Wines underlying such Transaction from a third party ("Markup"). Other than such Mark-up, Management Fees, or other costs associated with the Transaction such as a "Handling Fee" for the wine, as described below, the Company shall not charge the Contractholder any fees with respect to a Transaction. If a Contractholder makes a Deposit, Installment or other payment with a credit card, the Contractholder may be charged an additional transactional or Handling Fee to cover the costs and processing fees that the Account Manager and the Company may incur, and such fees will be disclosed in the Confirmation.

4.2     **Management Fee.** The Company shall be entitled to receive an annual management fee equal to two percent (2%) per annum of the aggregate Purchase Price of each Transaction (the "Management Fee") during the period the relevant Parcel is held by a Contractholder under the Contract. The Management Fee payable with respect to a Transaction shall accrue from the date of the Confirmation with respect to such Transaction until the earlier of (i) the sale of the Parcel underlying such Transaction by the Company or (ii) the making of a Delivery Election by the

Contractholder with respect to such Parcel. If the Company sells all or any portion of the Parcel underlying a Transaction, the entire Management Fee payable with respect to such Transaction shall be deducted from the sales proceeds payable upon the sale of such Parcel (or portion thereof). If a Contractholder makes a Delivery Election with respect to a Parcel underlying a Transaction, such Contractholder shall pay the Company the Management Fee payable with respect to such Transaction (to the extent not previously paid) prior to the release of such Parcel by the Company to the Contractholder.

**4.4     Ongoing Costs.** The Company shall be responsible for the payment of all costs and expenses associated with the purchase, storage and sale of the Wine underlying the Contract, including, without limitation, any insurance costs and warehousing fees, except as provided in the event of a Delivery Election or Delivery Notice as set forth in Sections 3.4 and 3.8 and any applicable Handling Fee.

**4.5     Taxes, Customs and Duties.** The Contractholder shall be responsible for the payment of any applicable sales or other taxes, customs and duty fees payable with respect to the purchase, sale, import or export of the Wine underlying the Contract.

5.     USE AND CONFIDENTIALITY OF INFORMATION.

**5.1     LICENSE OF CONTRACTHOLDER INFORMATION.** The Contractholder hereby grants to the Company a perpetual, non-exclusive license to use Contractholder Information in the manner set forth below. The Contractholder agrees that the Company, the Account Manager and any Affiliate may use the Contractholder Information solely for the purposes of giving effect to the Contract and generally for marketing other products or services offered by the Company, the Account Manager or Affiliates, and may share such information with the Account Manager or any Affiliate who may use the Contractholder Information for such purposes. The Contractholder Information may not be used for any other purpose, or shared with any other person without the prior written consent of the Contractholder. The Contractholder agrees that the Company, the Account Manager and the Affiliates may share Contractholder Information that does not personally identify the Contractholder (such as age, gender, income level, zip code, etc.) with any person and may use such Contractholder Information for any purpose. The Company will take reasonable steps to attempt to ensure that the person with whom the Company, the Account Manager or any Affiliate shares the Contractholder Information will comply with the Company's policy regarding use or disclosure of the Contractholder Information, and that such person will take reasonable precautions to protect such information.

**5.2     Content of Materials.** The Contractholder agrees that the Company retains all proprietary rights, title and interest, including copyright and trademark rights, in the Contract, the Memorandum and all materials of the Company, the Account Manager and the Affiliates, including but not limited to the text, images, and other multimedia data (the "Content") that is produced by or on behalf of the Company and distributed to the Contractholder. The Contractholder agrees that it will not copy, license, sell, transfer, make available or otherwise distribute the Content to any entity or person.

**5.3     Confidentiality.** The Contractholder agrees that the Contract, the Memorandum and all dealings with or through the Company, the Account Manager or the Affiliates shall be kept strictly confidential, and the Contractholder shall not disclose, directly or indirectly, except to the Contractholder's professional advisors such as a lawyer or accountant, any information relating to the Contract, the Memorandum or any dealings with or through the Company, the Account Manager or any Affiliate to any third party whatsoever. The Company may require that the Contractholder execute a non-disclosure agreement, in the form provided by the Company (a "Non-Disclosure Agreement"), under certain circumstances. The Contractholder acknowledges that the Company will suffer damages or loss as a result of the Contractholder's breach of this confidentiality clause or a Non-Disclosure Agreement.

**5.4    Contractholder's Breach of Confidentiality.** In the event that the Contractholder breaches the confidentiality clause of the Master Contract, the Company may terminate the Contract and its relationship with the Contractholder as set forth below in Section 7. Any disclosure by the Contractholder which is made where necessary to comply with any law applying to the Contractholder, or which is made under any order of a Court of competent jurisdiction, shall not constitute a breach of this Section. Similarly, any disclosure made by the Contractholder to obtain professional advice in respect of the Contract shall not constitute a breach of this Section, provided that the Contractholder procures in advance of such disclosure the agreement that such professional advisor to be bound by the terms of this Section.

6.    WAIVER OF EXPRESS & IMPLIED WARRANTIES.

**6.1    Disclaimer of All Express & Implied Warranties.** THE COMPANY HEREBY SPECIFICALLY DISCLAIMS ANY WARRANTY (ORAL OR WRITTEN) CONCERNING THE NATURE AND CONDITION OF ANY PARCEL, MAKES NO EXPRESS WARRANTY REGARDING ANY PARCEL AND SPECIFICALLY DISCLAIMS ANY IMPLIED WARRANTY REGARDING ANY PARCEL, INCLUDING ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. The Contractholder may make a claim that the Company will administer on the Contractholder's behalf as set forth in Section 3.5 hereof.

**6.2    No Express or Implied Warranties Regarding Saleability or any Other Matters Relating to Parcels.** THE COMPANY DISCLAIMS ANY AND ALL REPRESENTATIONS AND WARRANTIES, EXPRESS OR IMPLIED, AND MAKES NO REPRESENTATIONS OR WARRANTIES, REGARDING THE SALEABILITY OR FUTURE SALEABILITY OF ANY PARCEL. The Company will not make a warranty of any kind or analyze any Parcel to determine its saleability or merchantability. The Company does not authorize any person to make a warranty of any kind on its behalf, and the Contractholder should not rely on any statement by any person that may be construed as a warranty of any kind. The Contractholder acknowledges and agrees that the Company, the Account Manager, Account Representatives, and their respective principals, agents or employees have not made any covenants, promises, agreements, representations, inducements, conditions or other understandings, either written or oral, to the Contractholder with respect to the potential price for which any Parcel may be sold at any time. The Contractholder acknowledges and agrees that the provisions contained in this Section 6.2 are a material factor to the Company offering the Contract to the Contractholder and that the Company is unwilling to contract with the Contractholder unless the Company was released as expressly set forth above. The terms and conditions of this Section 6.2 will expressly survive the termination of the Contract and will not merge with the provisions of any other related Contracts.

7.    BREACH & LIABILITY UPON BREACH; INDEMNITY OF COMPANY.

**7.1    Event of Breach for the Company.** In the event that the Company or the Account Manager fails to exercise reasonable care and skill in performing its obligations hereunder in relation to the purchase by the Contractholder of a Parcel, the Company shall be in breach of the Contract. This Section 7.1 shall not create any agency or fiduciary relationship between the Company and the Contractholder.

**7.2    Event of Breach for Contractholder.** The Contractholder shall be in breach of this Master Contract and/or any Confirmation (i) upon a breach by the Contractholder of any obligation, representation or warranty of the Contractholder under this Master Contract or any Confirmation, including, without limitation, (a) the failure of the Contractholder to pay in full any Deposit, any Installment or the full Purchase Price with respect to any Transaction under this Master Contract or any Confirmation as and when due and payable, (b) any representation or warranty of the Contractholder made in this Master Contract or any Confirmation shall have been incorrect or misleading in any respect when made or confirmed, or any certificate or document of the

Contractholder furnished hereunder shall have been false or misleading as of its date, (c) the failure of the Contractholder to perform any term, covenant or agreement to be performed under this Master Contract or any Confirmation, or (d) a breach of the confidentiality provisions of Section 5 of this Master Contract or any Non-Disclosure Agreement; (ii) if, after the title to a Parcel passes to the Contractholder and the Holding Period with respect to such Parcel has expired, the Company fails in three (3) attempts to contact the Contractholder regarding the sale of such Parcel using the Contractholder Information; (iii) if Contractholder: (a) shall generally not, or be unable to, or shall admit in writing its inability to, pay its debts as its debts become due, (b) shall make an assignment for the benefit of creditors, or petition or apply to any tribunal for the appointment of a custodian, receiver or trustee for its or a substantial part of its assets, (c) shall commence any proceeding under any law relating to bankruptcy, reorganization, arrangement, readjustment of debt, dissolution or liquidation, (d) shall have had any such petition filed, or any such proceeding shall have been commenced against it, in which an adjudication is made or order for relief is entered or which remains undismissed for a period of 30 days, (e) shall have had a receiver, custodian or trustee appointed for all or a substantial part of its property, or (f) takes any action effectuating, approving or consenting to any of the events described in clauses (a) through (f); or (iv) if  Contractholder is involved in a proceeding which is likely to result in a forfeiture of all or a substantial part of the Contractholder's assets or a material judgment is entered against the Contractholder.

7.3     **Right to Cure Breach.** If a breach of the Contract as determined under Sections 7.1 and 7.2 is capable of being cured, the non-breaching party shall give written notice to the breaching party setting forth full particulars of the breach and requiring the breaching party to cure such breach within 15 days from the date the written notice is sent.  If the breach is not cured within 15 days from the date the written notice is sent, the breach is no longer subject to cure, and the non-breaching party is entitled to initiate action to collect any and all damages provided for under the Contract.

7.4     **Liability of Contractholder.** Except as otherwise provided herein, if a Contractholder fails to make the Deposit, any applicable Installment or any other payment with respect to a Transaction on or before the applicable date for such Deposit, Installment or other payment, as set forth in the Confirmation with respect to such Transaction, the Contractholder shall be in breach of the Master Contract and, as liquidated damages and not as a penalty, pay, turn over and give up to the Company any rights to or interest in the Deposit with respect to such Transaction and any other payments made to the Company with respect to such Transaction. The payment of the liquidated damages shall be without prejudice or limitation of any other rights or remedies to which the Company may be entitled.  Further, in the event of such breach, the Contractholder shall indemnify the Company against all losses and liabilities that the Company suffers or incurs as a result of such breach.

7.5     **Indemnity of Company, Account Manager, Account Representative, etc.** The Contractholder hereby releases, and agrees to indemnify the Company, the Account Manager, Account Representatives, their Affiliates, and any of their respective officers, directors, employees, representatives or agents against any and all claims, losses, damages, fines, costs, demands, expenses (including, without limitation, attorney's fees and costs), liabilities, enforcement actions, judgments and investigations (collectively, "Claims") arising out of this Master Contract and the Confirmations, a breach of any Non-Disclosure Agreement or its non-compliance with any laws or regulations applicable to the transportation of wine or alcohol, whether such action is brought by a governmental agency or other person or entity, other than those Claims due to conduct constituting willful misconduct, bad faith, fraud, gross negligence (as defined under Delaware law) or a breach of this Contract by the Company, the Account Manager or their respective Affiliates. Further, Contractholder agrees that it will not settle any such Claims or lawsuits without the prior written consent of the Company.  This indemnity shall survive the expiration or termination of the Contract. In its sole discretion, the Company can seek indemnification and monies in any manner that it deems necessary pursuant to the terms and conditions of the Contract.

8.    TERMINATION OF CONTRACT.

    8.1    **Termination by Breach.** Either party shall be entitled to terminate the Contract by written notice to the other party if such other party commits any breach of any of the provisions of the Contract pursuant to Section 7.1 or 7.2 hereof, which breach, to the extent curable, is not cured within the period provided in Section 7.3.

    8.2    **Rights of Contractholder upon Termination.** Except as otherwise provided for in this Master Contract, upon the termination of the Contract by the Contractholder, the Contractholder is entitled to take possession of any Parcel for which the Contractholder has paid the Purchase Price under the Contract.

    8.3    **Rights of the Company upon Termination.** Upon the termination of the Contract by the Company, the Company is entitled to seek all remedies set forth in Sections 7.4 and 7.5 hereof with regard to any Parcel that is the subject of the Contract.

9.    GOVERNING LAW & ARBITRATION.

    9.1    **Law.** The Contract shall be governed by and construed in accordance with the law of the British Virgin Islands, without regard to the conflicts of law provisions thereof, except for the application of Delaware law as set forth in Section 7.5.

    9.2    **Arbitration.** In the event that any dispute whatsoever arises between the Contractholder and the Company in relation to or in any way in connection with the Contract, the Contractholder and the Company hereby agree that such dispute shall be finally settled by binding arbitration in the British Virgin Islands applying British Virgin Islands law in accordance with the Rules of Arbitration of the International Chamber of Commerce ("ICC Rules"). Such arbitration shall be conducted before a panel of three (3) arbitrators, one of whom shall be appointed by the Contractholder, one of whom shall be appointed by the Company and the third arbitrator shall be appointed by the other arbitrators so chosen. If the arbitrators chosen by the parties ("Party Arbitrator(s)") fail to agree upon the appointment of the third arbitrator within one month after the second Party Arbitrator is appointed, the third arbitrator shall be appointed in accordance with the ICC Rules. If a claim arising under the Contract may be arbitrated by the Contractholder, then, unless the Contractholder's arbitrator is appointed within 6 months of the issuance of the request for arbitration, such claim arising under the Contract shall be deemed to be absolutely released, waived and barred and the Company shall be discharged from all liability. If the claim to be arbitrated is asserted by the Company, then, unless the Contractholder's arbitrator is appointed within 6 months of the issuance of the request for arbitration, the arbitration shall be determined by a single arbitrator appointed in accordance with the ICC Rules.  Each party to the arbitration proceeding shall be responsible for payment of one-half of the costs, arbitrators' fees and other expenses of the arbitration until a decision by the arbitration panel is rendered.  If a party fails to pay its share of such fees and expenses of the arbitration when due, the arbitration panel shall have the power immediately to issue an award in favor of the other party for the relief requested by such party. The parties hereto agree that any judgment, settlement or award rendered pursuant to such arbitration shall be a final and binding determination as to such matters described therein, and a judgment of any court having jurisdiction thereof shall be entered upon the award made pursuant to the arbitration. The arbitration panel shall not have the authority to award punitive damages. Notwithstanding the foregoing, if either party to this Agreement is named by a third party as a defendant in any action or proceeding, the party named as a defendant shall be entitled to assert against the other party to the Contract in such action or proceeding any claim which such party may have at law or equity and which arises out of the matter in controversy in such action or proceeding.

- 10 -

10.   NOTICES.

10.1   **To the Company.**  Any notice required or permitted to be given hereunder by the Contractholder to the Company shall be given in writing by registered post to its Account Manager, CFW Management Ltd., Unit 6, The Woodyard, Castle Ashby, Northampton NN7 1LF, England or such other address as shall be notified to the Contractholder from time to time.

10.2   **To the Contractholder.**  Any notice or other information required or authorized by the Contract to be sent by the Company to the Contractholder by hand or by first-class pre-paid postage, telex, cable, facsimile transmission or comparable means of communication to the Contractholder at the address and numbers set forth in the Contractholder Questionnaire.

11.   CONTRACTHOLDER REPRESENTATIONS.

11.1   The Contractholder acknowledges and agrees that the Contract might be deemed to be a security and that the offer and sale of the Contract has not been and will not be registered under the Securities Act of 1933, as amended (the "Securities Act"), or the securities laws of any jurisdiction, but rather is being entered into privately by the Company pursuant to the private placement exemption from registration provided in Section 4(2) of the Securities Act and Rule 506 of Regulation D ("Regulation D") promulgated thereunder by the United States Securities and Exchange Commission (the "SEC") as described in the Memorandum.  The Contractholder understands that, to the extent the Contract is deemed to be a security, no governmental agency has passed upon the Contractholder's rights under the Contract or made any findings or determination as to the fairness of the terms of the Contract from the perspective of the Contractholder.  The Contractholder understands that, to the extent the Contract is deemed to be a security, the Company is under no obligation to register the Contract on its behalf or to assist it in complying with any exemption from registration under the Securities Act.

11.2   The Contractholder agrees that, because the Contract might be deemed to be a security, it will not sell or otherwise transfer its rights under the Contract without registration under the Securities Act or an exemption therefrom, and fully understands and agrees that it must bear the economic risk of its purchases pursuant to the Contract for an indefinite period of time because, among other reasons, the Contractholder's rights under the Contract have not been registered under the Securities Act or under the securities laws of certain states and, therefore, to the extent the Contract is deemed to be a security, the Contract cannot be resold, pledged, assigned or otherwise disposed of unless it is subsequently registered under the Securities Act and under applicable securities laws of such states or an exemption from such registration is available.  The Contractholder acknowledges that it is aware and understands that the Company is under no obligation to register the Contractholder's rights under the Contract on its behalf or to assist it in complying with any exemption from such registration under the Securities Act.

11.3   The Contractholder represents that it has received and read a copy of the Memorandum outlining, among other things, the organization and objectives and policies of, and the risks and expenses of purchases pursuant to, the Contract, and the Contractholder hereby adopts all provisions therein.  The Contractholder represents that in making a decision to enter into a Contract that it has relied solely upon the Memorandum and its own independent investigations.  The Contractholder represents that entering into the Contract is consistent with its objectives and cash flow requirements and that its purchases pursuant to the Contract will not adversely affect its overall need for diversification and liquidity.  The Contractholder represents that it is not entering into the Contract as a result of or subsequent to (a) any advertisement, article, notice or other communications published in any newspaper, magazine or similar media or broadcast over television or radio, or (b) any seminar or meeting whose attendees, including the Contractholder, had been invited as a result of, subsequent to or pursuant to any of the foregoing.

11.4   The Contractholder represents that it has not reproduced, duplicated or delivered the Memorandum or the Contract to any other person, except its own professional advisors or as instructed by the Company.

- 11 -

11.5    The Contractholder represents that it has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of its purchases pursuant to the Contract and that it is able to bear such risks, and has obtained, in its judgment, sufficient information from the Company or the Company's authorized representatives to evaluate the merits and risks of such purchases.  The Contractholder represents that it has evaluated the risks of making purchases pursuant to the Contract and has determined that the Contract is suitable for it financially.

11.6    The Contractholder represents that it can afford a complete loss of the amounts it purchased pursuant to the Contract and that it can afford to hold its purchases under the Contract for an indefinite period of time.

11.7    The Contractholder represents that it is entering into the Contract for its own account and not with a view to distribute or resell its rights under the Contract, either as a whole or in part.

11.8    The Contractholder acknowledges that it is aware of and understands the method of compensation of the Company with respect to the Contract as set forth in Section 4 of this Master Contract and the Memorandum.

11.9    If the Contractholder is an employee benefit plan (a "Plan"), the fiduciary executing the Contract on behalf of the Plan (the "Fiduciary") represents and warrants to the Company that:

(1)    the Plan is not a participant-directed defined contribution plan unless each participant directing a purchase pursuant to the Contract is an accredited investor;

(2)    the Fiduciary has considered a number of factors with respect to the Plan's purchases pursuant to the Contract and has determined that, in view of such considerations, the entering into the Contract is consistent with the Fiduciary's responsibilities under ERISA. The Fiduciaries of such Plan represent and warrant that they have been informed of and understand the organization and objectives and policies of, and the risks and expenses of making purchases pursuant to, the Contract and that the decision to invest such Plan's assets pursuant to the Contract was made with appropriate consideration of relevant investment factors with regard to such Plan and is consistent with the duties and responsibilities imposed upon fiduciaries with regard to their investment decisions under ERISA.  Such factors include, but are not limited to:

(a)    the role such investment or investment course of action plays in that portion of the Plan's portfolio that the Fiduciary manages;

(b)    whether the investment or investment course of action is reasonably designed as part of that portion of the portfolio managed by the Fiduciary to further the purposes of the Plan, taking into account both the risk of loss and the opportunity for gain that could result therefrom;

(c)    the composition of that portion of the portfolio that the Fiduciary manages with regard to diversification;

(d)    the liquidity and current rate of return of that portion of the portfolio managed by the Fiduciary relative to the anticipated cash flow requirements of the Plan;

(e)    the projected return of that portion  of the portfolio managed by the Fiduciary relative to the funding objectives of the Plan;

(f)    an investment pursuant to the Contract is permissible under the documents governing the Plan and the Fiduciary; and

(g)    the risks associated with an investment pursuant to the Contract.

(3)     the Fiduciary (a) is responsible for the decision to invest pursuant to the Contract; (b) is independent of the Company, the Account Manager and the Affiliates; and (c) is qualified to make such investment decision.

11.10     If the Contractholder is, or is acting on behalf of, a benefit plan investor (as defined in the Plan Asset Regulation), the Contractholder represents and warrants that, its entering into, ownership and disposition of its rights under the Contract will not result in or constitute a "prohibited transaction" under Section 406 of ERISA or Section 4975 of the Code (or, in the case of a governmental or church plan, any similar federal, state or local law) for which an exemption is not available.

11.11     The Contractholder represents that it has consulted with its own advisors and is fully informed as to the legal and tax requirements within the Contractholder's own country (countries) and U.S. tax considerations applicable to Contractholder's entering into the Contract.

11.12     The Contractholder acknowledges that it is aware and understands that:

(1)     no Federal or state agency has passed upon the Contract or made any findings or determination as to the fairness or merits of the purchases pursuant to the Contract;

(2)     there are substantial risks of loss pursuant to the Contract incidental to the entering into the Contract, including those summarized in the Memorandum; and

(3)     the Company  and the Affiliates may compete with the Company for the acquisition of the Wines underlying the Contract and there are other potential conflicts as described in the Memorandum.

11.13     The Contractholder represents that the execution, delivery and performance by the Contractholder of the Contract are within the powers of the Contractholder, have been duly authorized and will not constitute or result in a breach or default under, or conflict with, any order, ruling or regulation of any court or other tribunal or of any governmental commission or agency, or any agreement or other undertaking, to which the Contractholder is a party or by which the Contractholder is bound, and, if the Contractholder is not an individual, will not violate any provisions of the incorporation papers, by-laws, indenture of trust or partnership agreement, as may be applicable, of the Contractholder.  The Contractholder represents that the signature on the Contract is genuine, and the signatory, if the Contractholder is an individual, has legal competence and capacity to execute the same, or, if the Contractholder is not an individual, the signatory has been duly authorized to execute the same, and the Contract constitutes a legal, valid and binding obligation of the Contractholder, enforceable in accordance with its terms.

11.14     The Contractholder acknowledges that it is aware and understands that Tannenbaum Helpern Syracuse & Hirschtritt LLP acts as counsel to the Company and the Affiliates. The Contractholder also acknowledges that it is aware and understands that, in connection with this offering of Contracts and subsequent advice to the Company, Tannenbaum Helpern Syracuse & Hirschtritt LLP will not be representing the Contractholders, and no independent counsel has been retained by the Company to represent Contractholders.

11.15     The Contractholder covenants to advise the Company in writing if any representation, warranty or any other information contained in the Master Contract becomes untrue.

11.16     The Contractholder acknowledges and agrees that (i) e-mail messages are not secure and may contain computer viruses or other defects, may not be accurately replicated on other systems, or may be intercepted, deleted or interfered with or without the knowledge of the sender or the intended recipient and that the Company does not make any warranties in relation to these matters; and (ii) the Company reserves the right to intercept, monitor and retain e-mail messages to and from its systems as permitted by applicable law. If the Contractholder has any doubts about the authenticity

- 13 -

of an email purportedly sent by the Company, the Contractholder shall be required to contact the purported sender immediately.

11.17    The Contractholder hereby agrees to comply with all tax, anti-money laundering and exchange control reporting requirements imposed on the Contractholder by any applicable jurisdiction in connection with the Contract.

11.18    The Contractholder confirms that the Company is authorized and instructed to accept and execute any instructions in respect of the Contract given by facsimile and acknowledges that the onus is on themselves to ensure that such instructions are received in legible form and undertake to confirm them in writing. The Contractholder agrees to indemnify the Company, the Account Manager and the Affiliates and agrees to keep them indemnified, against any loss of any nature whatsoever arising to each of them as a result of any of them acting on facsimile instructions. The Company may rely conclusively upon and shall incur no liability in respect of any action taken upon any notice, consent, request, instructions or other instrument believed, in good faith, to be genuine or to be signed by properly authorized persons.

11.19    The Contract (i) shall be binding upon the Contractholder and the heirs, legal representatives, successors, and permitted assigns of the Contractholder and shall inure to the benefit of the Company and its successors and assigns and (ii) shall, if the Contractholder consists of more than one person, be the joint and several obligation of each of such persons.

12.    MISCELLANEOUS PROVISIONS.

12.1    No Tax, Reporting Advice. The Contractholder acknowledges and agrees that the Company will not advise the Contractholder with regard to federal, state or local income tax considerations or other tax considerations and the applicable reporting requirements to the IRS and U.S. Treasury related to entering into a Contract with a foreign counterparty with Wine held in a warehouse located in a foreign jurisdiction that may be applicable to the Contractholder or any Transaction. The Contractholder is urged and expected to consult with the Contractholder's own tax advisor regarding such considerations and any relevant disclosures pertaining to international transactions and transactions with a foreign entity.

12.2    Complete Contract. The Contract constitutes the entire agreement made between the Contractholder and the Company. All other terms and conditions, including, without limitation, any representations or implied terms, are hereby expressly excluded and superseded by the Contract.

12.3    Amendments, Modification and Waiver. No amendment of this Contract will be effective unless it is in writing and signed by the parties. No waiver of satisfaction of a condition or non-performance of an obligation under the Contract will be effective unless it is in writing and signed by the party granting the waiver, and no such waiver will constitute a waiver of satisfaction of any other condition or non-performance of any other obligation. To be valid, any document signed by the Company pursuant to this section must be signed by an officer of the Company authorized to do so by the Company's board of directors.

12.4    Telephony. The Contractholder acknowledges that any telephone conversations between the Contractholder and the Company, its Account Manager or an Affiliate may be recorded for compliance purposes and, by signing this Master Contract, Contractholder consents to such recording of any telephone conversations.

12.5    Use of Words. Words importing the singular include the plural, and words importing the masculine also include the feminine.

12.6    Counterparts. The Contract may be executed in one or more counterparts, all of which, taken together, shall constitute the same Contract. The date of signature of the Contract shall be the date that the last party hereto executes the Contract whether in counterpart or not.

**12.7    Facsimile Signature.** The Contract may be executed by facsimile and such a signed facsimile shall have the same force and effect as an original signed Contract.

**12.8    Severability.**    If any portion of the Contract is unenforceable to any extent, the remainder of the Contract, or application of that provision to any persons or circumstances other than those as to which it is held unenforceable, will not be affected by that unenforceability and will be enforceable to the fullest extent permitted by law.

**12.9    Force Majeure.**  A party shall not be in breach of the Contract if such party's non-performance of its duties and obligations under the Contract is a result of any act of God, fire, act of government or state, war, civil commotion, insurrection, embargo, prevention from or hindrance in obtaining any raw materials, energy or other supplies, labour disputes of whatever nature or any other reason beyond the control of such party.  If either party is unable to perform its duties and obligations under the Contract as a direct result of the effect of one of those reasons, that party shall give written notice to the other of the inability, which notice shall set out full details of the reason for non-performance. The operation of the Contract shall be suspended during the period (and only during the period) in which the reason continues.  As soon as such reason ceases to exist, the party relying upon it to excuse its performance hereunder shall give written notice to the other party of this fact.  If the reason continues for a period of more than 90 days and substantially affects the commercial intention of the Contract, the party not claiming relief under this clause shall have the right to terminate the Contract upon giving 15 days written notice of such termination to the other party.

IN WITNESS WHEREOF, the Contractholder and the Company have each executed this Master Contract as of the date(s) indicated next to their signature.

THE "CONTRACTHOLDER"

By: _Bernard M Esen_

Name: _Bernard M Esen_
Title:
Date: _10/03/2013_

THE "COMPANY" VENULUM LTD.

By: _Ghanchi_

Name: _____
Title:
Date: _Oct 10, 2013_

**Faisal Ghanchi**
**Authorized Signatory**

- 15 -

**12.7   Facsimile Signature.** The Contract may be executed by facsimile and such a signed facsimile shall have the same force and effect as an original signed Contract.

**12.8   Severability.**   If any portion of the Contract is unenforceable to any extent, the remainder of the Contract, or application of that provision to any persons or circumstances other than those as to which it is held unenforceable, will not be affected by that unenforceability and will be enforceable to the fullest extent permitted by law.

**12.9   Force Majeure.** A party shall not be in breach of the Contract if such party's non-performance of its duties and obligations under the Contract is a result of any act of God, fire, act of government or state, war, civil commotion, insurrection, embargo, prevention from or hindrance in obtaining any raw materials, energy or other supplies, labour disputes of whatever nature or any other reason beyond the control of such party.  If either party is unable to perform its duties and obligations under the Contract as a direct result of the effect of one of those reasons, that party shall give written notice to the other of the inability, which notice shall set out full details of the reason for non-performance. The operation of the Contract shall be suspended during the period (and only during the period) in which the reason continues.  As soon as such reason ceases to exist, the party relying upon it to excuse its performance hereunder shall give written notice to the other party of this fact.  If the reason continues for a period of more than 90 days and substantially affects the commercial intention of the Contract, the party not claiming relief under this clause shall have the right to terminate the Contract upon giving 15 days written notice of such termination to the other party.

IN WITNESS WHEREOF, the Contractholder and the Company have each executed this Master Contract as of the date(s) indicated next to their signature.


THE "CONTRACTHOLDER"                         THE "COMPANY" VENULUM LTD.

By: _Bernard M Esen_                         By:_____

Name: _Bernard M Esen_                       Name:
Title:                                       Title:
Date: _10/03/2013_                           Date:

- 15 -

**EXHIBIT A**
Contractholder Questionnaire

*All information furnished herein is for the sole use of the Company, the Account Manager and the Affiliates and will be held in confidence by such entities in accordance with the terms of the Master Contract to which this exhibit is attached. Notwithstanding the foregoing, this questionnaire may be furnished to such parties as the Company, the Account Manager, the Affiliates and the Company's counsel deem necessary to establish compliance with federal or state laws. Any terms used herein but not defined shall have the respective meanings set forth in the Master Contract.*

*The Contractholder confirms and warrants to the Company the accuracy of the representations made by the Contractholder in this Contractholder Questionnaire.*

*This Contractholder Questionnaire, dated as of* Oct 3, 2013 *between the Contractholder identified below and the Company supplements, forms a part of and is subject to the Master Contract.*

I.    CONTRACTHOLDER INFORMATION

Bernard M Eisen                                          -7148

Name of Contractholder (Please Print or Type)        Social Security Number/Tax I.D.
                                                     Number

1.    Type of Contractholder—Please check one:

  [X] Individual            [ ] Registered Investment      [ ] Foundation
                                Company

  [ ] Partnership           [ ] Joint Tenants (with Rights  [ ] Endowment
                                of Survivorship)

  [ ] Corporation           [ ] Tenants in Common          [ ] Employee Benefit Plan

  [ ] Trust                 [ ] Individual Retirement Plan  [ ] Keogh Plan

  [ ] Limited Liability Company [ ] Charitable Remainder    [ ] Other
                                Trust

2.    Contractholder Contact Information and/or Primary Contact for this Master Contract:

Name of Individual: Bernard M Eisen

(Mr./Ms./Dr.) (Fist Name) (Middle Initial) (Last Name) (Suffix)

Name of Entity: _____
(If Applicable)
Birth Date: June 9, 1952
Citizenship or Place of Organization: USA
Address 1: 69 ALRAN DRIVE
Address 2: _____

- 16 -

City: _Williamsville,_

State/Province: _14221-821 AME, NY_

Zip/Postal Code: _14221-8219_

Country: _USA_

Telephone: _716--688-8411_

Facsimile: _____

E-mail (required): _bernardmeisen@gmail.com_

3. The following information is to be provided by Contractholders who are individuals, or by the person making the purchase decision on behalf of corporations, partnerships, trusts, or other entities.

(A)     Do you understand the merits and risks associated with purchases and sales of wine and champagne?

Yes __X__ No _____

(B)     Do you understand that there is no guarantee of any financial return on the purchasing and selling of wine and/or champagne and that you run the risk of suffering a total loss on the purchase and sale of wine and/or champagne?

Yes __X__ No _____

(C)     Please describe the level of education you have achieved:

_Post- Doctoral_

(D)     Please describe briefly your experience in purchasing wines or champagnes:

_7 Years_

(E)     Please describe briefly your experience in investing in equity or debt securities:

_25 Years._

II.   ACCREDITED INVESTOR QUESTIONNAIRE

The Contractholder certifies that the Contractholder is an "accredited investor" as defined in Section 4(2) of the Securities Act of 1933, as amended (the "Securities Act"), and Rule 506 of Regulation D promulgated thereunder by the United States Securities and Exchange Commission because:

(A)   Individuals



1.   The Contractholder has an individual net worth or joint net worth with his or her spouse, in excess of $1,000,000. As used herein, "net worth" means the excess of total assets at fair market value, including home furnishings (but exclusive of the Contractholder's primary residence up to its fair market value) and automobiles, over total liabilities;[1] or

2.   The Contractholder had individual income (exclusive of any income attributable to his or her spouse) of more than $200,000 in each of the past two years, or joint income with his or her spouse of more than $300,000 in each of those years, and reasonably expects to reach the same income level in the current year; or[2]

3.   The Contractholder is a director, executive officer, or general partner of the Company, or a director, executive officer, or general partner of a general partner of the Company.

(B)   Corporations, Endowments, Foundations, Partnerships or Limited Liability Companies

1.   The Contractholder (i) has total assets in excess of $5,000,000 and (ii) was not formed for the specific purpose of acquiring the Contracts offered; or

2.   Each of the Contractholder's equity owners is an accredited investor as described in this Section II. The Company, in its sole discretion, may request information regarding the basis on which such equity owners are accredited investors.

(C)   Employee Benefit Plans

1.   The Contractholder is an employee benefit plan within the meaning of ERISA, and the decision to invest in the Company was made by a plan fiduciary (as defined in Section 3(21) of ERISA), which is either a bank, savings and loan association, insurance company or registered investment advisor. The name of such plan fiduciary is: _____

2.   The Contractholder is an employee benefit plan within the meaning of ERISA and has total assets in excess of $5,000,000; or

3.   The Contractholder is a plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions for the benefit of its employees, and has total assets in excess of $5,000,000.

---

[1]   Note that any indebtedness secured by a Contractholder's primary residence in excess of the value of a Contractholder's primary residence should be considered a liability and deducted from the Contractholder's net worth.

[2]   For purposes of this Contract, individual income means adjusted gross income, as reported for federal income tax purposes, less any income attributable to a spouse or to property owned by a spouse, increased by the following amounts (but not including any amounts attributable to a spouse or to property owned by a spouse): (i) the amount of any tax-exempt interest income under Section 103 of the Code received; (ii) the amount of losses claimed as a limited partner in a limited partnership as reported on Schedule E of Form 1040; (iii) any deduction claimed for depletion under Section 611 et seq. of the Code; (iv) amounts contributed to an Individual Retirement Account (as defined in the Code) or Keogh retirement plan; (v) alimony paid; and (vi) any elective contributions to a cash or deferred arrangement under Section 401(k) of the Code.

(D) Individual Retirement Accounts, Keogh Plans and Other Self-Directed Defined Contribution Plans

☐      The Contractholder is an individual retirement account, Keogh Plan or other self-directed defined contribution plan in which a participant may exercise control over the investment of assets credited to his or her account and the investing participant is an accredited investor because such participant has a net worth of at least $1,000,000 or has had an individual income of at least $200,000 (or a joint income with spouse of at least $300,000) in each of the last two years and reasonably expects to reach the same income level in the current year. The Company, in its sole discretion, may request information regarding the basis on which such participants are accredited investors.

(E) Section 501(c)(3) Organizations

☐      The Contractholder (i) is an organization described in Section 501(c)(3) of the Code, (ii) has total assets in excess of $5,000,000 and (iii) was not formed for the specific purpose of acquiring the Contracts offered.

(F) Trusts

☐   1.   The Contractholder (i) has total assets in excess of $5,000,000, (ii) was not formed for the specific purpose of acquiring the Contracts offered and (iii) its purchase is directed by a sophisticated person. As used in the foregoing sentence, a "sophisticated person" is one who has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of the prospective investment; or

☐   2.   The Contractholder is: (i) a bank as defined in Section 3(a)(2) of the Securities Act, a savings and loan association, or other institution as defined in Section 3(a)(5)(A) of the Securities Act, (ii) acting in a fiduciary capacity and (iii) subscribing for the purchase of the Contracts being offered on behalf of a trust account or accounts; or

☐   3.   The Contractholder is a revocable trust which may be amended or revoked at any time by the grantors thereof and all of the grantors are accredited investors as described herein. The Company, in its sole discretion, may request information regarding the basis on which such grantors are accredited investors.

(G) Banks, Savings and Loans and Similar Institutions

☐   1.   The Contractholder is a bank as defined in Section 3(a)(2) of the Securities Act or a savings and loan association, or other institution as defined in Section 3(a)(5)(A) of the Securities Act acting in its individual capacity.

☐   2.   The Contractholder is an investment company registered under the Company Act or a business development company as defined in Section 2(a)(48) of that Act.

☐   3.   The Contractholder hereby certifies that it is a Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958.

(H) Insurance Companies

☐      The Contractholder is an insurance company as defined in Section 2(13) of the Securities Act.

**EXHIBIT B**

**Confirmation
with respect to the
Fine Wine Master Purchase Agreement**

**Master Purchase Agreement #: XXXXXX
dated as of _____**

**between Venulum Ltd. (the "Company") and
the party set forth herein as the "Contractholder"**

     The purpose of this agreement (this "Confirmation") is to set forth the details of the transaction to be entered into between the Company and the Contractholder as of the date hereof (the "Transaction"). The terms of the particular Transaction to which this Confirmation relates are as set forth on the Purchase or Sale Contract attached hereto [Confirmation Number]. This agreement constitutes a "Confirmation" as referred to in the Master Contract.

     1.    This Confirmation supplements, forms a part of, and is subject to, the Fine Wine Master Purchase Agreement dated as of _____, as amended and supplemented from time to time, between the Company and the Contractholder (the "Master Contract"). All provisions contained in, or incorporated by reference to, and terms defined in the Master Contract shall govern this Confirmation except as expressly modified below. In the event of any inconsistency between this Confirmation and the Master Contract, as the case may be, this Confirmation shall govern.

     2.    The Contractholder hereby acknowledges and agrees: (i) that, unless otherwise indicated herein, the undersigned is entering into the Transaction on the terms and conditions contained in the Master Contract, (ii) that all of the representations, warranties and covenants of the Contractholder contained in the Master Contract are true and correct as of the date hereof and (iii) that the information provided in the Master Contract, including the Contractholder Questionnaire is correct as of the date hereof. The Contractholder hereby reaffirms as of the date hereof the acceptance by the Contractholder of its indemnification obligations pursuant to the Master Contract. The Contractholder agrees to notify the Company promptly in writing should there be any change in any of the foregoing information.

     Please confirm that the foregoing and the Purchase/Sale Confirmation Attachment attached to this Confirmation correctly set forth the terms of the agreement between the Company and the Contractholder with respect to the Transaction by executing a copy of this Confirmation and returning it to the Company.

THE "CONTRACTHOLDER"       THE "COMPANY" VENULUM LTD.

By:_____     By:_____

Name:                    Name:
Title:                     Title:
Date:                     Date: