Ellenoff Grossman & Schole LLP

1345 Avenue of the Americas
New York, NY 10105
Telephone: (212) 370-1300
Facsimile: (212) 370-7889
www.egsllp.com

NOVEMBER 23, 2016

**VIA EMAIL**

Honorable Elizabeth A. Wolford
United States District Judge
Kenneth B. Keating Federal Building
100 State Street
Rochester, NY 14614
Email: peter_letteney@nywd.uscourts.gov

    Re:    <u>Eisen v. Venulum Ltd., et al. Docket No. 1:16-cv-461-EAW</u>

Dear Judge Wolford:

    As you are aware, our firm is counsel to Venulum Ltd. ("Venulum"), Giles Cadman, Mark Trotter, and Phillip Serrien (collectively with Venulum, the "Defendants") in the above-referenced matter. In accordance with Your Honor's request, we are writing to address the issues you raised during oral argument. As we understand, the following are the issues to be addressed:

    1.    What choice of law analysis should the Court apply in evaluating the enforceability of the arbitration provisions in the contracts at issue?

    2.    Does the Third Contract supersede the First and Second Contracts such that the Court need only consider the enforceability of the arbitration provision in the Third Contract?

    3.    In evaluating whether the arbitration provisions at issue are unconscionable, must the Court consider the six-month provision and the Second Contract's method for choosing an arbitrator?

**I.**    **The Court Should Apply New York Law to Evaluate the Enforceability of the Arbitration Provisions in the Contracts at Issue**

    New York law should govern the Court's analysis of the enforceability of the arbitration agreements. There is no discernable difference between the law of New York and the law of the British Virgin Islands.

Ellenoff Grossman & Schole LLP

### A. The Court Should Apply New York Law

"The question of whether a valid arbitration agreement exists at all is an issue of state law." *Rangone v. Atlantic Video at Manhattan Ctr.*, 07-6084, 2009 WL 4058480, at *2 (S.D.N.Y. Aug. 29, 2008), *aff'd* 595 F.3d 115 (2d Cir. 2010). "When contract formation is at issue in an FAA case, we generally apply state law principles." *Id.* (quoting *Adams v. Suozzi*, 433 F.3d 220, 227 (2d Cir. 2005)); *see also Colorado-Arkansas-Texas Distrib., L.L.C. v. Am. Eagle Food Prod, Inc.*, 525 F. Supp. 2d 428, 433 (S.D.N.Y. 2007). Moreover, "[i]t is clear that questions of contractual validity relating to the unconscionability of the underlying arbitration agreement must be resolved first, as a matter of state law, before compelling arbitration pursuant to the FAA." *Cap Gemeni Ernst & Young, U.S., L.L.C. v. Nackel*, 346 F.3d 360, 365 (2d Cir. 2003); *see also Dumais v. Citibank (South Dakota), N.A.*, No. 07-6070, 2007 WL 3253975, at *2 (W.D.N.Y. Nov. 2, 2007); *Anonymous v. JP Morgan Chase & Co.*, No. 05-2442, 2005 WL 2861589, at *5 (S.D.N.Y. Oct. 31, 2005) ("In determining whether a generally applicable contract defense may invalidate an arbitration agreement, a court looks to state law.") (citation omitted).

Given that state contract law governs the present analysis, the Court must turn to the conflict-of-laws rules of the state in which this Court sits to make a substantive determination. *See Cantor Fitzgerald Inc. v. Lutnick*, 313 F.3d 704, 710 (2d Cir. 2002) (in diversity cases, the Court must look to the conflict-of-laws rules of the forum state). Accordingly, under New York law, to determine the applicability of one jurisdiction's laws over another with respect to the interpretation of a contract, courts apply the "center of gravity" or "grouping of contacts" inquiry, which allows consideration of the "spectrum of significant contacts" in order to determine which jurisdiction's laws "have the most significant contacts to the particular contract dispute." *See Eagle Ins. Co. v. Singletary*, 279 A.D.2d 56, 59, 7171 N.Y.S.2d 351 (2d Dep't 2000). "In general, significant contacts in a case involving contracts, in addition to the place of contracting, are the place of negotiation and performance, the location of the subject matter of the contract, and the domicile or place of business of the contracting parties." *Id.*

Here, Plaintiff is a resident of New York and presumably negotiated and executed the applicable arbitration agreements from New York. Consequently, the underlying question as to the enforceability of the arbitration agreement, which is an entirely different issue from the law that will be applied to the arbitration itself, should be rendered in accordance with New York law.

### B. The Law of the British Virgin Islands Is Substantively Similar to New York

Should the Court consider BVI law, the arbitration provisions in all the contracts would be enforceable. For an explanation of BVI law on these issues, we respectfully refer the Court to the Expert Opinion of Andrew Thorp of the BVI law firm Harney Westwood & Riegels, annexed hereto as **Exhibit A**. Furthermore, Defendants consent to the application of New York law with regard to this Court's consideration of the arbitration provision.

Ellenoff Grossman & Schole LLP

## II. The Third Contract Does Not Supersede All Other Contracts

There are three separate contracts at issue. The first is dated March 29, 2007 (the "First Contract"), the second is dated March 16, 2010 (the "Second Contract"), and the third is dated October 3, 2013 (the "Third Contract"). (Compl. Exs. B, C & I, respectively.) Based on the contracts' execution dates, the relationship existed over a substantial period of years, and the contracts were entered into at distinct points in time. As an initial point, every contract contains an arbitration provision so this case does not present the fact pattern of an initial contract *not* containing an arbitration provision, and then one party forcing another party into a subsequent contract that contains an arbitration provision. The arbitration provisions uniformly appear in each and every contract in this case.

At this time, both the Second and Third Contracts remain enforceable against the parties. As set forth in the WHEREAS clauses of the Second Contract, a dispute existed between Eisen and Venulum over certain payments that Eisen failed to make under the First Contract. Eisen and Venulum resolved this dispute by the execution of the Second Contract, which required Eisen to pay $10,000.00 a year, over a ten year period and to purchase additional wines in the future. The manner by which wines are purchased is governed by the First and Third Contracts so once the Third Contract was executed in October 2013, the First Contract of March 2007 was superseded at that time. Thus, Eisen and Venulum have enforceable contractual obligations owing to each other under the Second and Third Contracts.

Moreover, the merger provision in Section 12.2 of the Third Contract does not supersede the independent contractual arrangement contained in the Second Contract. The merger clause applies to all prior negotiations and understandings with regard to that contract and the wine purchases and sales to occur after the execution of the Third Contract. Indeed, the Second Contract requires that Eisen make additional purchases of wine before his physical wine is to be released. Should he purchase additionally wine today, that purchase would be pursuant to the Third Contract. However, the contractual obligations related to the settlement are set forth in the Second Contract, and those provisions remain effective.

## III. The Court Need Not Consider the Six-Month Limitation or the Manner of Selecting the Arbitrators Because the Defendants Waive Any Potentially Unconscionable Aspects of Those Provisions, And In Any Event, Neither Is Substantively Unconscionable

The six-month limitation contained in two of the contracts, along with the unilateral right of Venulum to appoint the sole arbitrator as set forth in the Second Contract, need not be considered by the Court because Defendants agree to waive any potentially unconscionable aspects of those provisions, including the following:

- **The six-month provisions contained on Page 4 of the First Contract and Section 9.2 of the Third Contract, although to the extent Section 9.2 of the Third Contract merely establishes a time line for Eisen to select an**

Ellenoff Grossman & Schole LLP

> arbitrator once an arbitration has been filed, Defendants maintain that such a provision has not been triggered, as no arbitration has been demanded.

- **Defendants' ability to unilaterally appoint the sole arbitrator pursuant to Section 8 of the Second Contract.**

Moreover, even if those provisions are considered, they are not alone unconscionable, and the limitation period in the First Contract is irrelevant because it was superseded by the Third Contract as discussed above.

### A. The Court Need Not Consider the Six-Month Limitation or the Manner of Selecting the Arbitrators Because Defendants Waive Any Potentially Unconscionable Aspects of Those Provisions

In *Rangone v. Atlantic Video at Manhattan Center*, 595 F.3d 115 (2d Cir. 2010), the party seeking to avoid an arbitration agreement argued that several portions of the agreement were substantively unconscionable. Affirming the district court's decision upholding the arbitration agreement, the Second Circuit noted that the district court "avoided consideration of the unconscionability of any of the disputed terms" for two applicable reasons. *Id.* at 122.

First, the defendants "agreed to waive the statutes of limitations and fee shifting provisions as set out in the arbitration agreement" and therefore found that these provisions "do not render the [arbitration] agreement substantively unconscionable." *Id.* Moreover, "as to the provision of the arbitration agreement that forbids any appeal of the arbitrator's decision, the district court found that the defendant's representation that this would 'not prevent the plaintiff from moving to vacate an arbitration award in federal court,' pursuant to the provisions of the FAA, defeated the argument that the provision was unconscionable." *Id.*

The plaintiff in *Rangone* objected to the district court's "piecemeal approach," but the Second Circuit was "compelled to reject" the plaintiff's argument and affirm the decision. *Rangone*, 595 F.3d at 123. Specifically, the Circuit upheld the district court's acceptance of the defendant's waivers of two provisions of the arbitration agreement that may have been substantively unconscionable. *Id.* Although the plaintiff maintained that "the district court erred in accepting these waivers because the arbitration agreement, when considered as a whole, is 'packed with oppressive and unlawful provisions meant to disadvantage the employee,'" the Second Circuit agreed with the district court's holding that New York law "would allow for the enforcement of the arbitration agreement as modified by the defendants' waivers." *Id.* at 124.

"New York courts have accepted offers by parties to waive the enforcement of certain provisions of arbitration agreements as modified by the parties' after-the-fact waivers." *Id.* (citing *Brower v. Gateway 2000, Inc.*, 246 A.D.2d 246, 676 N.Y.S.2d 569, 574-75 (1st Dep't 1998) ("remanding for the determination of whether a substitute

arbitration agreement alleviated the unconscionability problems of the original provision"); *In re Currency Conversion Fee Antitrust Litig.*, 265 F. Supp. 2d 385, 411-412 (S.D.N.Y. 2003) (defendants' offer to pay arbitration-related fees and to waive fee-shifting rights meant plaintiff could not rely on arbitration costs as ground for finding arbitration agreement unconscionable).

"Because unconscionability is an equitable defense to the enforcement of harsh or unreasonable contract terms," *Ragone*, 595 F.3d at 124 (citing *Doctor's Assocs., Inc. v. Jabush*, 89 F.3d 109, 113 (2d Cir. 1996)), "a party cannot complain when the defendant through its waivers declines to enforce any potentially unconscionable term." *Id.; see also Schreiber v. K-Sea Transportation Corp.*, 9 N.Y.3d 331, 849 N.Y.S.2d 194 (2007) (New York Court of Appeals held that the offending provision of an arbitration agreement should simply be disregarded rather than precluding a party from being able to vindicate its rights in arbitration by rendering the entire agreement void).

Ultimately, "'the appropriate remedy' when a court is faced with a plainly unconscionable provision of an arbitration agreement – one which by itself would actually preclude a plaintiff from pursuing [his] statutory rights – 'is to sever the improper provision of the arbitration agreement, rather than void the entire agreement.'" *Rangone*, 595 F.3d at 125 (quoting *Brady v. Williams Capital Group, L.P.*, 64 A.D.3d 127, 878 N.Y.S.2d 693, 701 (1st Dep't 2009)).

**Here, the six-month limitation period in which Plaintiff is permitted to file for arbitration following an alleged injury in the First Contract and a provision in the Second Contract that allows Defendants to select the sole arbitrator, are waived by the Defendants.** To the degree that they offend any notion of substantive unconscionability, the Court need not consider them. *See Rangone*, 595 F.3d at 125 ("we can enforce an agreement that modifies a provision that otherwise might be unconscionable").[1]

### B. The Six Month Limitation and the Manner of Selecting Arbitrators Is Not Unconscionable

Understanding the historical relationship between the parties is an important consideration in light of the allegations of coercion and duress contained in the complaint. The central factual allegations contained in the complaint are that Eisen was coerced to sign the contracts due to unreasonable time deadlines, intimidation, oppression, and that these factors amounted to a contract of adhesion. (Compl. ¶¶161-170). Indeed, the procedural element of unconscionability concerns the contract formation process and the alleged lack of meaningful choice. *Nayal v. HHP Network Services IPA, Inc.*, 620 F. Supp. 2d 566 (S.D.N.Y. 2009) (citing *State v. Wolowitz*, 96 A.D.2d 47, 468 N.Y.S.2d 131, 145 (1983). The allegations of the complaint fail to allege what the coercion was. If fact, Eisen cannot meaningfully allege coercion because that would be the farthest from the truth.

---

[1] Defendants further note that each of the contracts contains a severability clause in which any unenforceable provision will not render the remaining provisions void.

Ellenoff Grossman & Schole LLP

The complaint does not allege that Eisen lacked any meaningful choice regarding the First Contract that contained the initial arbitration clause. In March 2007, Eisen elected of his own volition to purchase wine fines through Venulum, and Eisen does not refer to any allegation in his complaint that the terms of the arbitration provision in the First Contract are unconscionable or that Venulum refused to negotiate its terms.

As for the Second Contract, which settled a payment dispute between the parties, Venulum did negotiate with Eisen with regard to the terms of that agreement. This is evidenced by emails between Venulm's attorney Michael Meredith and Eisen's attorney Jonathan Schechter in February and March 2010. A true and correct copy of the correspondence is attached hereto as **Exhibit B**. Starting as early as January 2009, Eisen retained an attorney named Jonathan Schechter to represent him regarding his commercial dispute with Venulum regarding certain payments that were not made by Eisen under the First Contract.

From 2009 through March 16, 2010, the date the Second Contract was signed, Eisen's counsel, Mr. Schechter, negotiated to reach an agreement with Venulum regarding the First Contract. On April 28, 2009, Michael Meredith, on behalf of Venulum, emailed Mr. Schechter regarding the potential resolution with Eisen. In that correspondence, Mr. Meredith discusses the revisions provided by Schechter to the document and the requested alterations on behalf of Eisen. These requested revisions were contained in an email from Schechter dated April 10, 2009, a copy of which is attached hereto as **Exhibit C**. Although other issues were addressed, Eisen's counsel requested no revisions to the arbitration provision and did not make any comment regarding the arbitration provision even though it was patently present in every draft.

Eisen's allegation that Venulum imposed a five day time limit to either enter the contract or lose his investment is taken out of context, is not accurate and is belied by Eisen's attorney's own interactions with Venulum. Yes, Venulum did impose a five day deadline after attempting to work and negotiate with Eisen for approximately a year to resolve his breach of the First Contract. Demanding a deadline after a year's time cannot amount to coercion and duress, and is simply not supported by the facts or common sense.

In addition, on numerous occasions, Eisen represented himself as an accredited investor and a financially sophisticated individual. This is evidenced by a recorded audio on September 24, 2013, in which Mark Trotter reads a disclaimer to Eisen and the written contractual terms. The recorded conversation transcript certified by the declaration of Giles Cadman attached hereto states:

> Trotter: the Venulum group and its representatives do not give investment advice or tax advice, past performance is not indicative of future return, alternative assets are not regulated and you are not buying shares in a fund or investing directly into Venulum. You are buying wine which may have no value in the future. It's important to understand that there are no guarantees that the wine will have any value in the future and you may suffer a complete loss. When you opened your Venulum account, you

Ellenoff Grossman & Schole LLP

warranted to us that you were a sophisticated accredited investor and as such, you understand the merits and risks of investing. You also understand that past performance is not indicative of future results. Do you understand that Bernie?

Eisen: I do.

*See* Transcript of Telephone Call, Notarized on November 17, 2016, annexed hereto as **Exhibit D.**

In addition, Eisen held himself out in writing to be a sophisticated investor who understood the risks in the Client Questionnaire attached to the First Contract. (Compl. Ex. B.) In Section 11 of the Third Contract, Eisen again represented and warranted that he understood the Third Contract, the risks associated, that he could afford a complete loss, and how the Company was to be compensated as set forth in the provisions of Section 4 of the Third Contract. (Compl., Ex. I, Sections 11.5-11.8.) By Eisen's own verbal and written representations and warranties, he was sophisticated, understood the contracts, and was capable of making investment decisions while understanding the risks. At the very least, he could appreciate the import of an arbitration provision.

Taking the above factual background as a whole, Venulum finds it difficult to comprehend how Eisen was coerced in any manner that rises to the level of unconscionability. Eisen is a doctor who is a highly educated person and held himself out on multiple occasions to be an accredited and sophisticated investor who was represented by counsel. It defies logic how he can now claim that he did not understand the import of an arbitration provision that appeared in all three contracts that were executed over a six year period. Eisen's allegations of unequal bargaining power, coercion and duress are utterly misplaced.

All three contracts entered into by Eisen with Venulum regarding their commercial relationship contained arbitration provisions. A review or the three arbitration provisions demonstrates that they all contain relatively the same terms. First, they all agree that the law of the British Virgin Islands will apply to the arbitration proceedings. Second, they all agree that arbitration is the sole form of adjudication for disputes arising out of the contracts. Third, the Rules of the International Chamber of Commerce apply. Fourth, the arbitration provisions contain similar restraints regarding the appointment of arbitrators once a dispute arises and a party is notified. The arbitration provisions in the First and Third Contracts are essentially identical.

The seminal difference in the arbitration clause contained in the Second Contract is that there will only be one arbitrator conducting the arbitrations, and that single arbitrator was to be selected by Venulum. While, this procedural difference may strike of inequality, Eisen, a sophisticated and accredited investor by his own admission, and his lawyer did not attempt to negotiate, amend or remove this arbitration provision in the Second Contract. In conclusion, Eisen agreed with Venulum to adjudicate all disputes arising from the

Ellenoff Grossman & Schole LLP

contracts through binding arbitration, under BVI law, using the ICC rules, and with the agreed arbitrators. This agreement to arbitrate is in all three separate and distinct contracts.

Moreover, the six month limitation is not unconscionable as it applies to the time frame that a party has to appoint an arbitrator. The six month limitation does not reduce or impede a limitations period, but is a mechanism to compel participation in the arbitration process. The applicable language in the Third Contract states:

> If a claim arising under the contract may be arbitrated by the Contractholder, then, unless the Contractholder's arbitrator is appointed within 6 months of the issuance of the request for arbitration, such claim arising under the Contract shall be deemed to be absolutely released, waived and barred and the Company shall be discharged from liability.

(Compl. Ex. I, Section 9.2.) This clause would require Eisen to appoint an arbitrator within six months of instituting the notice for arbitration or have his claims released. Just like in court proceedings if a party does not answer in the prescribed time, default is entered. It simply forces a client to move forward with the arbitration proceeding once instituted, and a six month time frame to appoint an arbitrator is very reasonable.

On the other hand, if Venulum initiates the arbitration proceeding and the client refuses to appoint an arbitrator and participate in the proceeding, then the claim moves forward before the single arbitrator.

> If the claim to be arbitrated is asserted by the Company, then, unless the Contractholder's arbitrator is appointed within 6 months of the issuance of the request for arbitration, the arbitration shall be determined by a single arbitrator appointed in accordance with the ICC Rules.

(Compl. Ex. I, Section 9.2.) As such, the client does not lose his or her rights, the arbitration just moves forward, and the client could still participate.

The six month limitation period in the arbitration clause of the Third Contract does not reduce any applicable statute of limitations period, but provides a mechanism to move the arbitration proceeding forward once instituted. In fact, Venulum would concede that Eisen's claims, should he have any, would be governed by applicable statutory limitation periods not the six-month limitation period in the Third Contract. There is no New York law to support the proposition that a six-month limitation period to simply appoint an arbitrator would violate the unconscionable standard.

Ellenoff Grossman & Schole LLP

## IV. Conclusion

The facts and law above demonstrate that New York law should guide the Court to determine that the arbitration provisions are neither procedurally unconscionable nor substantively unconscionable, and that Plaintiff's Complaint should be dismissed.

Respectfully yours,

*[signature]*

ELLENOFF GROSSMAN & SCHOLE LLP
Michael J. Sullivan
Glen A. Sproviero
1345 Avenue of the Americas
New York, New York 10105
Telephone: 212.370.1300
Facsimile: 212.370.7889
gsproviero@egsllp.com
msullivan@egsllp.com

*Attorney for Defendants Venulum, Ltd., Giles Cadman, Mark Trotter, and Philip Serrien*