UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

BERNARD M. EISEN,

              Plaintiff,

      v.

VENULUM LTD., GILES CADMAN,
individually, MARK TROTTER, individually,
and PHILLIP SERRIEN, individually,

              Defendants.

---

**DECISION AND ORDER**

1:16-CV-00461 EAW

## I.    <u>Introduction</u>

Bernard M. Eisen ("Plaintiff"), a citizen and resident of New York, filed this action on June 8, 2016, claiming violations of both the Securities Act of 1933 ("the '33 Act") and the Securities Act of 1934 ("the '34 Act"), and related state-law claims of unconscionability, fraud, civil conspiracy, and intentional infliction of emotional distress. (Dkt. 1). Plaintiff's claims arise out of Plaintiff's investment with Venulum Ltd. ("Venulum"), and involve actions by Venulum's principal, Giles Cadman ("Cadman"), and two Venulum employees, Mark Trotter ("Trotter"), and Phillip Serrien ("Serrien") (together "Defendants"). (*Id.*). Venulum Ltd. is a corporation incorporated in the British Virgin Islands ("BVI"), with its principal place of business in Toronto, Canada. (*Id.* at 1). Cadman resides in the United Kingdom. (*Id.* at 2). Trotter and Serrien reside in Canada. (*Id.*).

- 1 -

Before the Court is Defendants' motion to compel arbitration. (Dkt. 7). The Court received briefing from the parties, heard oral arguments, and received supplemental briefing following oral argument. (Dkt. 7; Dkt. 11; Dkt. 13; Dkt. 18; Dkt. 20; Dkt. 21; Dkt. 22). Because the arbitration provisions are substantively unconscionable and would require Plaintiff to forego his rights and remedies under the applicable securities laws of the United States, the motion to compel arbitration is denied.

## II.   Factual Background[1]

### A.   The First Contract

Plaintiff first invested with Venulum in 2007, after repeated phone calls from Defendant Serrien to Plaintiff's home in Williamsville, New York. (Dkt. 1 at 3-4). Serrien was soliciting investments in wine, in which, according to Serrien, Venulum "possessed a high degree of experience and sophistication." (*Id.* at 3). Serrien promised Plaintiff an 8% return on his investment. (*Id.*). After an initial agreement via phone to invest $1,000 in 2007, Plaintiff made a number of additional investments with Venulum. (*Id.* at 4). Plaintiff alleges he was not provided sufficient documentation to piece together the fair market value of his account, the true nature of his investment, or the criteria Venulum used to evaluate the suitability of possible investments, all violations of federal securities laws. (*Id.* at 4-5).

On October 7, 2008, Plaintiff entered into a wine purchase contract with Venulum (the "First Contract"). (*Id.* at 5). The First Contract contained an arbitration clause

---

[1]   The facts here are primarily those alleged in the complaint.

which required that any dispute arising under the contract be:

> referred to binding arbitration in the British Virgin Islands applying British Virgin Islands law: Such arbitration shall be before one arbitrator appointed by [Plaintiff], one arbitrator appointed by Venulum Ltd. and one arbitrator appointed by such two arbitrators, if either or both of them considers it appropriate: The Arbitrators' costs will be borne equally by [Plaintiff] and Venulum Ltd.: The arbitration shall take place in accordance with the Rules of the International Chamber of Commerce.
>
> If the claim to be arbitrated is a claim by [Plaintiff], then unless [Plaintiff's] arbitrator is appointed within six months of the dispute arising, such claim shall be deemed to be absolutely released, waived and barred and Venulum shall be discharged from all liability.

(Dkt. 1-2 at 5).

"Between October 7, 2008, and March 16, 2010, Plaintiff invested approximately $122,480.64 under the [First Contract]." (Dkt. 1 at 6). Serrien represented to Plaintiff that Plaintiff could liquidate his holdings at any time with 10-days' notice. (*Id.* at 4).

### B.   The Second Contract

In "early 2010," Plaintiff told Serrien that he wished to liquidate his holdings. (*Id.* at 6). Thereafter, Defendant Trotter became Plaintiff's main contact at Venulum, and Plaintiff no longer had any contact with Serrien. (*Id.*). Trotter told Plaintiff that he could not liquidate the account in the manner described by Serrien. (*Id.*). Trotter told Plaintiff that Plaintiff could liquidate his investment only if Plaintiff signed a second investment contract (the "Second Contract"), which Plaintiff did on March 16, 2010. (*Id.*). Plaintiff was told that he would lose "all or substantially all of his investment of $122,480" unless he signed the Second Contract. (*Id.* at 7). Trotter explained that if Plaintiff invested an additional $100,000, he would be entitled to the return of the previously invested

- 3 -

$122,480. (*Id.*). Plaintiff invested the additional $100,000 ahead of the contract's schedule, in an attempt to liquidate the $122,480 as quickly as possible. (*Id.* at 8).

The Second Contract, like the First, contained an arbitration clause:

> In the event that any dispute whatsoever arises between the Parties in relation to or in any way in connection with this Agreement, the Parties hereby agree that such dispute shall be referred to binding arbitration in the British Virgin Islands applying British Virgin Islands law. Such arbitration shall be before an arbitrator appointed by Venulum. The arbitration shall take place in accordance with the Rules of the International Chamber of Commerce.

(*See* Dkt. 1-3 at 3).

### C.   Venulum's SEC Violations

The Securities and Exchange Commission ("SEC") charged Venulum and Cadman with violations of the '33 Act on February 15, 2012, alleging that Venulum "raised approximately $22,000,000 through the unregistered offerings of (a) investment contracts involving interests in fine wines; and (b) promissory notes from which proceeds were used as working capital for Venulum Ltd., Venulum Inc., and other businesses affiliated with Giles Cadman." *Sec. & Exch. Comm'n v. Venulum Inc. et al.*, 3:12-cv-00477-N, Dkt. 1, at *1 (N.D. Tex. Feb. 15, 2012). They were alleged to have solicited investments through an instrument which constituted a "security" without registering with the SEC, in violation of §§ 5(a) and 5(c) of the '33 Act. *Id.* at *4. By consent, Venulum Inc., Venulum Ltd., and Giles Cadman were "permanently restrained and enjoined from violating Section 5 of the Securities Act" by selling any security in the United States without registering with the SEC. *Sec. & Exch. Comm'n*, 3:12-cv-00477-

N, Dkt. 11, Dkt. 12, Dkt. 13 (N.D. Tex. Feb. 27, 2012). Thereafter, Venulum entered into similar consent decrees with state regulators in South Carolina and Wisconsin. (Dkt. 1-5; Dkt. 1-6).

Plaintiff alleges that Trotter was prohibited by a 1998 Wisconsin state order from selling securities in Wisconsin without registering under state law. (Dkt. 1-8 at 4). A purported order by the Wisconsin Securities Commission states that Trotter had violated state securities laws "by transacting business in Wisconsin as a securities agent without a license." (*Id.* at 3).

On July 10, 2013, to comply with the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 852 (2010), the SEC adopted the so-called "Bad Actor" disqualification provisions under Regulation D of the '33 Act. *See* Sec. & Exch. Comm'n, *Disqualification of Felons and Other "Bad Actors" from Rule 506 Offerings and Related Disclosure Requirements* (Sept. 19, 2013) [hereinafter "Sec. & Exch. Comm'n, *Bad Actor Disclosure Requirements*"], *available at* https://www.sec.gov/info/smallbus/secg/bad-actor-small-entity-compliance-guide.htm.

Any "covered" person who "has a relevant criminal conviction, regulatory or court order or other disqualifying event that occurred on or after September 23, 2013," is disqualified from relying on certain exemptions from compliance with the '33 Act in the sale of securities to accredited investors. *Id.*; 17 C.F.R. § 230.506 (Regulation D Rule 506). Covered individuals include securities issuers, the directors of an issuer, and "persons compensated for soliciting investors." Sec. & Exch. Comm'n, *Bad Actor*

*Disclosure Requirements.*  Disqualifying events include court injunctions and restraining orders arising in connection with the purchase or sale of a security that are in effect at the time of the sale of the security and that were entered within the previous five years.  *Id.* Disqualifications under final orders of state regulators are also disqualifying events.  *Id.*

"Disqualification will not arise as a result of disqualifying events that occurred before September 23, 2013," but those events must be disclosed to investors in writing before the sale of a security under Rule 506.  *Id.*  Rule 506 allows exceptions from the requirement to register a security with the SEC before sale.  *See* 17 C.F.R. § 230.506. However, "Rule 506 is unavailable to an issuer that fails to provide the required disclosure, unless the issuer is able to demonstrate that it did not know and, in the exercise of reasonable care, could not have known that a disqualifying event was required to be disclosed."  *Id.*

Plaintiff alleges that Venulum, Cadman, and Trotter were covered persons under the Bad Actor provision of the '33 Act, that they had disqualifying events at the time of the sale of the investment securities to Plaintiff, and that they failed to disclose the disqualifying events to Plaintiff. (Dkt. 1 at 12-13).  Plaintiff also alleges that none of the Defendants were registered as broker-dealers under SEC regulations, and, therefore, they were not registered to sell securities in the United States. (*Id.* at 13).

### D.   The Third Contract

Plaintiff became aware of the SEC Consent Order in October 2013, and thereafter requested a return of his investment and liquidation of his account. (*Id.*).  According to

Plaintiff, Trotter required Plaintiff to enter into yet another contract (the "Third Contract") before Plaintiff could get any of his money back from Venulum. (*Id.*). "Trotter threatened the complete loss of Plaintiff's investment, which at the time was over $200,000." (*Id.*). Plaintiff signed the Third Contract on October 3, 2013, "under the extreme duress of losing his entire investment." (*Id.*).

The Third Contract, like the others, included an arbitration clause:

> In the event that any dispute whatsoever arises between [Plaintiff] and [Venulum] in relation to or in any way in connection with the Contract, [Plaintiff] and [Venulum] hereby agree that such dispute shall be finally settled by binding arbitration in the British Virgin Islands applying British Virgin Islands law in accordance with the Rules of Arbitration of the International Chamber of Commerce ("ICC Rules"). Such arbitration shall be conducted before a panel of three (3) arbitrators, one of whom shall be appointed by [Plaintiff], one of whom shall be appointed by [Venulum] and the third arbitrator shall be appointed by the other arbitrators so chosen. If the arbitrators chosen by the parties ("Party Arbitrator(s)") fail to agree upon the appointment of the third arbitrator within one month after the second Party Arbitrator is appointed, the third arbitrator shall be appointed in accordance with the ICC Rules. If a claim arising under the Contract may be arbitrated by [Plaintiff], then, unless [Plaintiff's] arbitrator is appointed within 6 months of the issuance of the request for arbitration, such claim arising under the Contract shall be deemed to be absolutely released, waived and barred and [Venulum] shall be discharged from all liability. If the claim to be arbitrated is asserted by [Venulum], then, unless [Plaintiff's] arbitrator is appointed within 6 months of the issuance of the request for arbitration, the arbitration shall be determined by a single arbitrator appointed in accordance with the ICC Rules. Each party to the arbitration proceeding shall be responsible for payment of one-half of the costs, arbitrators' fees and other expenses of the arbitration until a decision by the arbitration panel is rendered. If a party fails to pay its share of such fees and expenses of the arbitration when due, the arbitration panel shall have the power immediately to issue an award in favor of the other party for the relief requested by such party.

(Dkt. 1-9 at 11).

By the terms of paragraph 11.1, the Third Contract relies on the private placement exception to SEC Rule 506. (*Id.* at 12). If Plaintiff's allegations are true, this reliance necessitated compliance with the Bad Actor provisions of Regulation D, and required disclosure of any previous disqualifying event by Venulum, Cadman, and/or Trotter to Plaintiff. Plaintiff claims that no such disclosure was made. (Dkt. 1 at 16). Plaintiff further claims that "[i]n the nearly 10 years that Plaintiff has interacted with Venulum, Plaintiff has never received, or been offered, any third-party confirmation of Venulum's representations as to its wine holdings, storage, financial condition or the use of Plaintiff's funds." (*Id.*).

## III.   **Discussion**

Defendants have moved to compel arbitration under the terms of the contracts.[2] (Dkt. 7). Defendants argue that arbitration is required under the contracts, and that the Court should dismiss the action, or stay proceedings until after arbitration is complete.

---

[2]     Either Cadman or Trotter signed each agreement on behalf of Venulum. (Dkt. 7-1 at 13). Serrien is not a signatory to any of the three contracts. This does not prevent him from moving to compel arbitration. *See JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 177 (2d Cir. 2004) ("[A] non-signatory to an arbitration agreement may compel a signatory to that agreement to arbitrate a dispute where a careful review of the relationship among the parties, the contracts they signed, and the issues that had arisen among them discloses that the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed.") (internal quotations omitted). Here, Serrien was an employee of Venulum and was Plaintiff's main point of contact with Venulum until Plaintiff attempted to liquidate his investment under the First Contract. Plaintiff's claims include assertions that Serrien violated federal securities laws and perpetrated a fraud by inducing Plaintiff to sign the First Contract. Therefore, Serrien's involvement is "intertwined" with at least one of the arbitration agreements at issue, and Serrien can move to compel arbitration even though he did not sign any of the agreements. *See id.* Plaintiff does not challenge Serrien's standing to compel arbitration. (*See* Dkt. 11).

- 8 -

(Dkt. 7-1 at 5).  Plaintiff argues that the arbitration clauses are void and unenforceable. (Dkt. 11 at 5).  Plaintiff further argues that the Court lacks jurisdiction to compel arbitration in the BVI.  (*Id.*).

## A.     The Third Contract Supersedes the Prior Two Contracts

As a threshold matter, the Court must determine which of the three contracts' arbitration clauses is operable.  The parties agree that the arbitration clause in the First Contract has been superseded.  (*See* Dkt. 20 at 4; Dkt. 21 at 3).  The parties disagree as to whether the Third Contract superseded the Second.  Plaintiff argues that the "arbitration clause in the Third Contract necessarily supersedes the previous two," because the Third Contract's arbitration clause provides for arbitration of "any dispute" between Plaintiff and Venulum relating to the contract. (Dkt. 20 at 4).   More specifically, the arbitration clause in the Third Contract requires that if "any dispute whatsoever arises between [Plaintiff] and [Venulum] in relation to or in any way in connection with the Contract, [Plaintiff] and [Venulum] hereby agree that such dispute shall be finally settled by binding arbitration." (Dkt. 1-9 at 11).  The Third Contract also includes a merger clause, which states that the Third Contract "constitutes the entire agreement made between the Contractholder and the Company. All other terms and conditions, including, without limitation, any representations or implied terms, are hereby expressly excluded and superseded by the Contract." (*Id.* at 15).  Defendants argue that this provision "does not supersede the independent contractual arrangement contained in the Second Contract," in

that the Third Contract's "any dispute" language applies only to "prior negotiations and understandings with regard to [the Third Contract]. . . ." (Dkt. 21 at 3).

"Under New York law, [i]t is well established that a subsequent contract regarding the same matter will supersede the prior contract." *Applied Energentics, Inc. v. NewOak Capital Mkts., LLC*, 645 F.3d 522, 526 (2d Cir. 2011); *see, e.g.*, *Barnum v. Millbrook Care Ltd. P'ship*, 850 F. Supp. 1227, 1236 (S.D.N.Y. 1994), *aff'd* 43 F.3d 1458 (2d Cir. 1994). However, "a broad arbitration clause in an agreement survives and remains enforceable for the resolution of disputes arising out of that agreement subsequent to the termination thereof and the discharge of obligations thereunder" unless a merger clause in a subsequent agreement serves to supersede the prior agreement to arbitrate. *Primex Int'l Corp. v. Wal-Mart Stores, Inc.*, 89 N.Y.2d 594, 598-99 (1997). A general merger clause "typically containing the language . . . that it 'represents the entire understanding between the parties,'" only serves to require "full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to vary or contradict the terms of the writing." *Id.* at 599. Where a later contract includes only that general language in its merger clause, the clause does not terminate a requirement to arbitrate issues that arose under a prior agreement. *See id.* at 600-01; *id.* at 601 ("[A]bsent a more specific indication of intent to abandon contractual rights to an arbitration forum, a general release terminating the substantive rights of the parties to the contract will not nullify their obligation to submit to an arbitrator all of the disputes relating to that contract and its termination."). Where there is a showing of specific intent for a subsequent contract to supersede a prior

- 10 -

agreement to arbitrate, the later contract's language controls. *See Goldman, Sachs & Co. v. Golden Empire Sch. Fin. Auth.*, 764 F.3d 210, 216 (2d Cir. 2014) (finding that "all-inclusive and mandatory" language in a subsequent agreement superseded a prior agreement to arbitrate); *Applied Energetics*, 645 F.3d at 525 n.2 (finding that where a merger clause went well beyond stating that the agreement only "represent[ed] the entire understanding between the parties" by including language that "there are no agreements or understandings" between the parties except for those in specified documents, the merger clause served to terminate a prior agreement to arbitrate).

Here, the language of the Third Contract expresses a desire of the parties for the Third Contract to supersede both prior contracts. The arbitration clause of the Third Contract requires that "any dispute whatsoever" between Plaintiff and Venulum "in relation to or in any way in connection with the Contract" be subject to arbitration in accordance with the arbitration terms of the Third Contract. (Dkt. 1-9 at 11).

"Contract" is defined broadly to include not only the Third Contract, but also any transaction between the parties. (*Id.* at 2). The merger clause states not only that the Third Contract "constitutes the entire agreement between [Plaintiff] and [Venulum]," but also that "all other terms and conditions . . . are hereby expressly excluded and **superseded** by the [Third] Contract." (*Id.* at 15 (emphasis added)). The terms of the merger clause do not evince only a desire to have the parol evidence rule fully applied; the language states an intention of the parties to completely replace and "supersede" any

- 11 -

prior agreement with the terms of the Third Contract.  *See Primex Int'l Corp.*, 89 N.Y.2d at 599; *Applied Energetics*, 645 F.3d at 525 n.2.

The language of the Third Contract belies Defendants' assertion that the Second Contract is still operative.  The Second Contract required, in consideration for settling a dispute under the First Contract, that Plaintiff "contribute an additional $10,000.00 per annum over a ten (10) year period towards physical wine purchases." (Dkt. 1-3 at 3).  In addition to the express language of the Third Contract's arbitration and merger clauses, the Third Contract contains two WHEREAS clauses which, read in conjunction, further suggest that the Third Contract superseded the Second.  The first such clause states that Plaintiff "from time to time may wish to acquire fine wines or champagne" from Venulum and "either take delivery of such fine wines or champagne or have [Venulum] sell such fine wines or champagne on [Plaintiff's] behalf." (Dkt. 1-9 at 2).  The very next clause states that Plaintiff and Venulum "wish to establish and agree upon certain terms and conditions that will apply to **any such Transaction** between [Plaintiff] and [Venulum]." (*Id.* (emphasis added)).  The Second Contract was, in essence, a contract for the further purchase of wine.  The Third Contract, by its terms, superseded all prior contracts and established the terms and conditions for "any" transaction between Plaintiff and Venulum regarding the sale of wines or champagne.  The Second and Third Contracts, though perhaps drafted with different underlying motivations, were both for the sale of wine.  A subsequent contract regarding the same matter supersedes an earlier contract. *Applied Energentics*, 645 F.3d at 526.  Thus, the Third Contract superseded the

Second Contract, and only the Third Contract's arbitration clause remains enforceable. However, in an abundance of caution, and because it does not change the Court's analysis, the Court will address both the validity of the Second and Third Contracts' arbitration clauses below.

### B.    Validity of the Arbitration Clauses

Defendants' argument—that the Court is required to compel arbitration under the contracts—requires that the arbitration clauses be enforceable. (*See* Dkt. 7-1). Plaintiff argues that they are not enforceable. (Dkt. 11). Before compelling arbitration, a reviewing court is required to decide two threshold issues: (1) whether the arbitration agreement is valid; and (2) whether the dispute is within the scope of the arbitration agreement. *Cap Gemini Ernst & Young, U.S., L.L.C. v. Nackel*, 346 F.3d 360, 365 (2d Cir. 2003). Because Plaintiff asserts federal statutory claims, if the arbitration provisions survive the two threshold hurdles, the court must then consider whether Congress intended those statutory claims to be nonarbitrable. *See Parisi v. Goldman, Sachs & Co.*, 710 F.3d 483, 486 (2d Cir. 2013); *see, e.g., JLM Industries, Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 169 (2d Cir. 2004).

The Federal Arbitration Act ("FAA") states that an arbitration clause "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "[I]t is difficult to overstate the strong federal policy in favor of arbitration. . . ." *Arciniaga v. Gen. Motors Corp.*, 460 F.3d 231,

234 (2d Cir. 2006). "But emphatic application does not amount to automatic application." *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 121 (2d Cir. 2010).

An arbitration clause is a matter of contract law. *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010). Arbitration clauses "may be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability." *Id.* at 68; *see, e.g.*, *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011). A challenge to the contract as a whole is not sufficient to prevent the enforcement of an arbitration clause, because an arbitration provision is severable from the rest of the contract. *Rent-A-Center*, 561 U.S. at 71; *see, e.g.*, *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403-04 (1967). Under the FAA, the party seeking to invalidate an arbitration clause must show that the arbitration clause itself was invalid. *Rent-A-Center*, 561 U.S. at 71-72. "If a party challenges the validity . . . of the precise agreement to arbitrate at issue, the federal court must consider the challenge before ordering compliance with that agreement. . . ." *Id.* at 71; *see, e.g.*, *Duran v. J. Hass Group, L.L.C.*, 531 F. App'x 146, 147 (2d Cir. 2013) ("We assume that if [the plaintiff] had claimed that the arbitration agreement itself was unconscionable due to the forum selection clause, the District Court would have had to consider whether the arbitration agreement was unconscionable prior to dismissing the suit."); *Celltrace Commc'ns Ltd. v. Acacia Research Corp.*, 15-CV-4746 (AJN), 2016 WL 3407848, at *2 (S.D.N.Y. June 16, 2016) ("[W]here one party argues that there is no valid arbitration agreement, courts have decided the question of arbitrability."), *appeal pending*, No. 16-2326 (2d Cir.). If the challenge is to the validity

- 14 -

of the contract as a whole, the issue is for the arbitrator to decide in the first instance. *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445-46 (2006); *Rent-A-Center*, 561 U.S. at 70.

Here, as required by *Rent-A-Center*, Plaintiff has challenged the validity of the arbitration clauses.  (*See* Dkt. 11 at 17-21).   The FAA does not require that a party challenge an arbitration provision in the complaint, but, as here, the challenge can be made in response to a motion to compel.  *See Rent-A-Center*, 561 U.S. at 72 ("The District Court correctly concluded that Jackson challenged only the validity of the contract as a whole.  Nowhere in his opposition to Rent-A-Center's motion to compel arbitration did he even mention the delegation provision.").

### 1.   This Court Must Decide Whether the Arbitration Clause are Valid

Defendants' main argument is that it is the province of the arbitrator, and not the Court, to determine whether the arbitration clauses are valid or invalid.  (Dkt. 13 at 5-10). Defendants rely on *Shaw Group Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115 (2d Cir. 2003) for the proposition that under the International Chamber of Commerce ("ICC") arbitration rules "any question of arbitrability must be decided by the arbitral tribunal." (Dkt. 13 at 6).  *Shaw Group* provides that if the parties reference the ICC rules of arbitration in an arbitration clause they have "evince[d] a clear and unmistakable agreement to arbitrate arbitrability," and the court is required to defer questions of arbitrability to the arbitrator. *Shaw Group*, 322 F.3d at 121.

It is settled law that it is the province of the court to "resolve any issue that calls into question the formation or applicability of the specific arbitration clause that a party seeks to have the court enforce." *Granite Rock Co. v. Int'l Bhd. Of Teamsters*, 561 U.S. 287, 297 (2010); *see, e.g., id.* at 299-300 ("[O]ur precedents hold that courts should order arbitration of a dispute only where the court is satisfied that neither the formation of the parties' arbitration agreement nor (absent a valid provision specifically committing such disputes to an arbitrator) its enforceability or applicability to the dispute is in issue. Where a party contests either or both matters, the court must resolve the disagreement.") (internal citations omitted); *Rent-A-Center*, 561 U.S. at 71 ("If a party challenges the validity under [FAA] § 2 of the precise agreement to arbitrate at issue, the federal court must consider the challenge before ordering compliance with that agreement under [FAA] § 4."); *Contec Corp. v. Remote Sol., Co., Ltd.*, 398 F.3d 205, 208 (2d Cir. 2005) ("[T]here is a general presumption that the issue of arbitrability should be resolved by the courts."). To have an arbitrator determine arbitrability, the party asserting so must "point to a clear and unmistakable expression of the parties' intent to submit arbitrability disputes to arbitration." *NASDAQ OMX Grp., Inc. v. UBS Sec., LLC*, 770 F.3d 1010, 1032 (2d Cir. 2014).

There is no language in the contracts expressly stating that disputes concerning arbitrability should be resolved by arbitration. *Cf. Mumin v. Uber Techs. Inc.*, 15-CV-6143 (NGG) (JO), 15-CV-7387 (NGG) (JO), 2017 WL 934703, at *9-10 (E.D.N.Y. Mar. 8, 2017) (finding that where a contract arbitration provision specifically stated that

disputes, including the enforceability of arbitration provisions, were to be decided by the arbitrator, and not by a court or judge, the issue of arbitrability must be decided in arbitration). Nonetheless, each arbitration clause in this case includes a requirement that all disputes under the contracts be sent to arbitration, and that the ICC rules will control during the arbitration. (Dkt. 1-2 at 5; Dkt. 1-3 at 3; Dkt. 1-9 at 11). *Shaw Group* involved an interpretation of ICC Rule 6.2, which was amended after *Shaw Group* was decided and renumbered Rule 6.3. The text of the rule, at the time *Shaw Group* was decided, provided that the arbitrator determined the validity of the arbitration agreement "if **any party** raises one or more pleas concerning the existence, validity or scope of the arbitration agreement." *Shaw Group*, 322 F.3d at 122 (emphasis added). Today, ICC Rule 6.3 provides:

> If any party **against which a claim has been made** . . . raises one or more pleas concerning the existence, validity or scope of the arbitration agreement or concerning whether all of the claims made in the arbitration may be determined together in a single arbitration, the arbitration shall proceed and any question of jurisdiction or of whether the claims may be determined together in that arbitration shall be decided directly by the arbitral tribunal. . . .

International Chamber of Commerce, *ICC Rules of Arbitration*, Art. 6 ¶ 3 (Jan. 1, 2012) (emphasis added), *available at* https://iccwbo.org/dispute-resolution-services/arbitration/rules-of-arbitration/#article_6. The parties disagree over what the change in language means. Plaintiff asserts that the language of Rule 6.3, as currently enacted, states that the arbitrator determines validity only if the party **against** whom a claim is asserted challenges the validity of the clause. (Dkt. 11 at 12-13). Because Plaintiff is asserting

the claim and arguing that the clauses are invalid, Plaintiff argues that Rule 6.3 does not relegate the issue of validity to the arbitrator. (*Id.*).

Defendants argue that although the Rule's language was changed after the Second Circuit's decision in *Shaw Group*, the meaning of the Rule did not change, and, therefore, the Court must defer to the arbitrator on any issue of validity as required by *Shaw Group*. (Dkt. 13 at 6-8).   Defendants point to the ICC Handbook, which reiterates the language of the old rule, while not explaining what the change in language actually means. (*Id.* at 7 (citing Thomas H. Webster & Michael W. Buhler, *Handbook of ICC Arbitration: Commentary, Precedents, Materials* ¶ 6-26 (3d ed. 2014) ("Article 6(3) provides that . . . arbitration should proceed if . . . **a party raises** one or more pleas concerning the existence, validity or scope of the arbitration agreement" (emphasis added)))). Essentially, Defendants ask the Court to ignore the change in the language of the Rule.[3]

---

[3]     The new ICC rules apply to both the Second and Third Contracts, even though they were enacted after the Second Contract was signed on March 16, 2010. (*See* Dkt. 1 at 6).   The Second Contract's arbitration clause does not specify whether arbitration must be held in accordance with the ICC rules in effect at the time that the contract was signed, or those in effect at the time of the arbitration. (*See* Dkt. 1-3 at 3, 6); *cf. Woodson v. Loram Maint. of Way, Inc.*, No. 10-CV-6263L, 2011 WL 6033012, at *1 (W.D.N.Y. Dec. 5, 2011) (describing a contract in which the arbitration clause required arbitration in accordance with certain rules "in force at the time of the claim or dispute").   However, ICC Rule 6.1 provides that "[w]here the parties have agreed to submit to arbitration under the [ICC] Rules, they shall be deemed to have submitted ipso facto to the Rules in effect on the date of commencement of the arbitration, unless they have agreed to submit to the Rules in effect on the date of their arbitration agreement."   International Chamber of Commerce, *ICC Rules of Arbitration*, Art. 6 ¶ 1 (Jan. 1, 2012) (emphasis added), *available at* https://iccwbo.org/dispute-resolution-services/arbitration/rules-of-arbitration/ #article_6; *see, e.g.*, Thomas H. Webster & Michael W. Buhler, *Handbook of ICC Arbitration: Commentary, Precedents, Materials* ¶ 6-20 (3d ed. 2014) ("Article 6(1) establishes the presumption that the applicable rules are the current Rules unless the

The plain language of the Rule advises that Plaintiff is correct, and only when the party against whom a claim is asserted challenges the validity of an arbitration agreement is the issue of arbitrability decided by the arbitrator.[4]  The plain meaning of the terms, as enacted by the ICC, should control the Court's interpretation.  *See United States v. Mo. Pac. R. Co.*, 278 U.S. 269, 278 (1929) ("[W]here the language of an enactment is clear, and construction according to its terms does not lead to absurd or impracticable consequences, the words employed are to be taken as the final expression of the meaning intended.").  Here, only Plaintiff makes a claim. Under the language of Rule 6.3, as currently fashioned, Plaintiff's challenge to the arbitration clause is not required to be heard by the arbitrator because Plaintiff is not the party "against whom" the claim is

---

parties have agreed on the rules as of the date of the arbitration agreement. Article 6 of the 1998 Rules had a similar provision."). Thus, the parties agreed to use the ICC rules in effect at the time any arbitration would commence.  No such arbitration has yet commenced, and, therefore, Rule 6.3 as it is currently in force applies to the Second Contract.  In other words, the analysis as to why the issue of arbitrability should be decided by the Court, as opposed to the arbitrator, applies equally to the Second and Third Contracts.

[4]      The Court acknowledges that at least two other courts have addressed the new Rule 6.3 in the context of *Shaw Group*, and applied *Shaw Group* despite the change in language from the 2012 amendments.  *See Microsoft Corp. v. Samsung Elecs. Co., Ltd.*, 60 F. Supp. 3d 525, 529 (S.D.N.Y. 2014) (stating that "[t]he version of the ICC Rules currently in force has a substantially similar provision" to the one in force at the time *Shaw Group* was decided); *Kastner v. Vanbestco Scandanavia, AB*, No. 5:14-cv-141, 2014 WL 6682440, at *5-6 (D. Vt. Nov. 25, 2014) (interpreting Rule 6.3 as requiring the issue of arbitrability to be decided by the arbitral body, in accordance with *Shaw Group*).  Nonetheless, this Court cannot reconcile the changed language to the ICC rules—plainly mandating the issue of arbitrability to only be decided by the arbitral tribunal where the validity of the arbitration agreement is raised by the party "against which a claim has been made"—with a finding that *Shaw Group* requires the issue of arbitrability to be decided by the arbitrator.  Thus, to the extent that those cases hold otherwise, this Court disagrees with their conclusions.

asserted.   The language of Rule 6.3, as currently in force, does not "clearly and unmistakably commit[] to arbitration" Plaintiff's validity challenge.  *See NASDAQ OMX Grp.*, 770 F.3d at 1032 (requiring more than a reference to certain arbitration rules which provide that arbitrability be decided by the arbitrator to "clearly and unmistakably" require a court to delegate arbitrability).   Therefore, even if *Shaw Group* requires the Court to defer to the arbitrator on issues of validity where contemplated in the ICC rules, the ICC rules as currently enacted do not provide for the issue of arbitrability to be decided by the arbitrator in this case.  This conclusion is only further buttressed by the Supreme Court's pronouncements in *Granite Rock*, and *Rent-A-Center* that this Court is responsible for determining issues of validity before compelling arbitration.[5]  *See Granite Rock*, 561 U.S. at 297; *Rent-A-Center*, 561 U.S. at 71.

---

[5]      The Second Circuit seemingly reaffirmed the central holding of *Shaw Group* after the Supreme Court's decision in *Rent-A-Center* and after the 2012 amendments.  *See VRG Linhas Aereas S.A. v. MatlinPatterson Glob. Opportunities Partners II L.P.*, 717 F.3d 322, 326-27 (2d Cir. 2013).  However, that case turned on an interpretation of ICC Rule 6.2, as in effect prior to the 2012 amendments.  As noted above, the rules "in effect on the date of commencement of the arbitration" control during the arbitration.  *ICC Rules of Arbitration*, Art. 6 ¶ 1.  The dispute at issue in *VRG Linhas Aereas* was referred to arbitration in December 2007, such that Rule 6.2, as it was then enacted, attached.  *See id.* at 324; *see also* Brief for Appellant at 58, *VRG Linhas Aereas S.A. v. MatlinPatterson Glob. Opportunities Partners II L.P.*, No. 12-593-cv, ECF No. 35 (2d Cir. Apr. 19, 2012) (stating that the arbitration clause at issue in that litigation "adopt[ed] the then-current ICC Arbitration" and citing to Rule 6.2).  Because Rule 6.2 was at issue, a straight-forward application of *Shaw Group* was appropriate.  That is not the case here, where the amended rule—Rule 6.3—applies.  As such, *Shaw Group* and *VRG Linhas Aereas* are not dispositive.

### 2.    The Arbitration Clauses are Unconscionable

Plaintiff can avoid arbitration of his claims under the Second and Third Contracts if the arbitration clauses are void. *Rent-A-Center*, 561 U.S. at 71. Plaintiff asserts that both arbitration clauses are unconscionable, and therefore unenforceable, under New York law. (Dkt. 11 at 5).

"[I]t is possible that an arbitration agreement may contain terms so onerous as to render it unenforceable under Section 2 of the FAA. Further, it is clear that questions of contractual validity relating to the unconscionability of an arbitration agreement must be resolved first, as a matter of state law, before compelling arbitration pursuant to the FAA." *Ragone*, 595 F.3d at 121 (citing *Cap Gemini*, 346 F.3d at 365) (internal quotations omitted).[6]

### a.    New York Law Applies in Determining Unconscionability

Because the Court is sitting in diversity, it must first determine what jurisdiction's law of unconscionability applies. Both the Second and Third Contracts state that BVI law governs the contracts. (Dkt. 1-3 at 3; Dkt. 1-9 at 11). However, the parties stipulate

---

[6]    Defendants argue that "the Second Circuit has clearly held that an arbitration provision may be challenged only where such provision was entered by fraud in the inducement." (Dkt. 13 at 7-8). Defendants cite *Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.*, 117 F.3d 655 (2d Cir. 1997) for the proposition that **only** fraud in the inducement can invalidate an arbitration clause. (*Id.*). Defendants misread *Campaniello*—which does not support Defendants' assertion in any way—and have failed to acknowledge (more recent) Supreme Court and Second Circuit cases which incontrovertibly declare that all contract defenses are available to invalidate an arbitration clause. *See, e.g.*, *Rent-A-Center*, 561 U.S. at 68. Even if Defendants reading of *Campaniello* was correct, *Campaniello*'s holding would be inconsistent with the Supreme Court's decision in *Rent-A-Center*, and would, therefore, not be controlling.

that New York law controls in determining unconscionability. (*See* Dkt. 20 at 2-4; Dkt. 21 at 1-2)   The Court agrees that New York law on unconscionability applies to this determination.

A federal district court is required to apply the choice-of-law rules for the state in which it sits. *Liberty Synergistics Inc. v. Microflo Ltd.*, 718 F.3d 138, 153 (2d Cir. 2013) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.*, 313 U.S. 487, 494-97 (1941)).   In determining a conflict-of-law issue in New York, the court must first determine whether there is an actual conflict. *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998) (citing *Matter of Allstate Ins. Co. and Stolarz*, 81 N.Y.2d 219, 223 (1993)).   A federal court can apply foreign law, as long as doing so would not "be violative of fundamental notions of justice or prevailing concepts of good morals." *Id.*

Defendants assert that "[t]here is no discernable difference between the law of New York and the law of the British Virgin Islands."[7] (Dkt. 21 at 1).   Plaintiff does not dispute this assertion. (*See* Dkt. 20).   Thus, if there is no discernable difference as the parties appear to agree, the Court could dispense with a choice-of-law analysis and apply New York Law. *See Curley*, 153 F.3d at 12 (citing *J. Aron & Co. v. Chown*, 647 N.Y.S.2d 8 (1st Dept. 1996)).

However, even if there is a conflict, New York law applies.   "New York law is clear in cases involving a contract with an express choice-of-law provision . . . a court is

---

[7]    Defendants submitted with their post-hearing briefing an "expert opinion" on the BVI law of unconscionability. (*See* Dkt. 21-1).   Plaintiff objects to the expert opinion. (Dkt. 22 at 1-2).   Because New York law applies to this issue, the Court need not decide whether the expert opinion is properly before the Court.

to apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction." *Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 556 (2d Cir. 2000); *see, e.g.*, *Cap Gemini*, 346 F.3d at 365. Here, there are, at most, minimal contacts between the contract and the BVI. Venulum is a corporation incorporated in the BVI, but has its principal place of business in Toronto, Canada. (Dkt. 1 at 1). Plaintiff is a resident of New York. (*Id.*). Defendants Serrien and Trotter—Plaintiff's main points of contact with Venulum—are residents of Canada. (*Id.* at 2). Cadman is a resident of the United Kingdom. (*Id.*). Nothing in the contracts, besides the choice-of-law provisions and the arbitration clauses, point to any contacts with the BVI. (*See* Dkt. 1-2; Dkt. 1-3; Dkt. 1-9). Based on the record before the Court, no acts committed pursuant to the contract occurred in the BVI. (*See id.*). Although the contract may have "significant contacts" sufficient to use BVI law if Venulum's principal place of business, and not merely its incorporation, were in the BVI, Defendants provided no information asserting as such. *See Cap Gemini*, 346 F.3d at 366 ("While the choice of New York law would be reasonable, and hence enforceable, if Cap Gemini's 'principal place of business' were in New York, creating significant contacts to the state, the record in this case merely reveals that Cap Gemini's 'headquarters' are in New York.").

Conversely, the contracts do have extensive contacts with New York. Plaintiff resides in New York, and was solicited by Venulum (through Serrien and Trotter) while he was physically located in New York. Plaintiff signed all three contracts in New York.

- 23 -

Plaintiff also sent money to Venulum from New York. Therefore, even though the contracts contain express choice-of-law provisions, the contracts do not have "sufficient contacts" to mandate the use of BVI law. Therefore, New York's law applies to determine whether the arbitration clauses are unconscionable.

### b.   The Arbitration Clauses are Unconscionable

New York law on unconscionability is quite clear.

> Under New York law, a contract is unconscionable when it is "so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforceable . . . according to its literal terms." *Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1, 10, 537 N.Y.S.2d, 534 N.E.2d 824 (1988). Generally, there must be a showing that such a contract is both procedurally and [substantively] unconscionable. *See id.* "The procedural element of unconscionability concerns the contract formation process and the alleged lack of meaningful choice; the substantive element looks to the content of the contract, per se." *State v. Wolowitz*, 96 A.D.2d 47, 468 N.Y.S.2d 131, 145 (1983); *see also Desiderio v. National Ass'n of Sec. Dealers, Inc.*, 191 F.3d 198, 207 (2d Cir. 1999) ("A contract or clause is unconscionable when there is an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." (quotation marks omitted)).

*Ragone*, 595 F.3d at 122 (quoting *Nayal v HIP Network Servs. IPA, Inc.*, 620 F. Supp. 2d 566, 571 (S.D.N.Y. 2009)). Unconscionability is determined at the time of the contract. U.C.C. § 2-302(1). A court reviewing a contract for unconscionability is required to fully explore the facts and circumstances surrounding the agreement. *King v. Fox*, 418 F.3d 121, 135 (2d Cir. 2005).

"Procedural and substantive unconscionability operate on a sliding scale; the more questionable the meaningfulness of choice, the less imbalance in a contract's terms

should be tolerated and vice versa." *Hojnowiski v. Buffalo Bills, Inc.*, 995 F. Supp. 2d 232, 238 (W.D.N.Y. 2014) (quoting *David v. No. 1 Mktg. Serv., Inc.*, 979 N.Y.S.2d 375, 378-79 (2d Dep't 2014)). Although New York law generally requires both procedural and substantive unconscionability to render a contract provision void, "there have been exceptional cases where a provision of the contract is so outrageous as to warrant holding it unenforceable on the ground of substantive unconscionability alone." *Gillman*, 73 N.Y.2d at 12. The unconscionability doctrine is flexible, and is "intended to be sensitive to the realities and nuances of the bargaining process." *Id.* at 10.

Procedural unconscionability examines the contract-formation process and focuses on "the size and commercial setting of the transaction, whether deceptive or high-pressured tactics were employed, the use of fine print in the contract, the experience and education of the party claiming unconscionability, and whether there was disparity in bargaining power." *Id.* at 11 (internal citation omitted); *see, e.g., Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 787 (2d Cir. 2003).

Plaintiff asserts that the Second and Third arbitration clauses were each procedurally unconscionable. (Dkt. 11 at 18-21). The Court notes that Plaintiff holds a doctorate degree (D.D.S.). (Dkt. 1 at 1). It is unclear how much experience Plaintiff had as an investor at the time that his claims arose, though Plaintiff did affirm in the Third Contract that he had 25 years of experience investing in equity or debt securities, and that he was an "accredited investor" under SEC rules. (Dkt. 1-9 at 19-20). Further, "the

contract provisions at issue were set forth in a clear and legible manner. . . ." *See Morris v. Snappy Car Rental, Inc.*, 84 N.Y.2d 21, 30 (1994).

Plaintiff asserts that the Second Contract's arbitration clause was procedurally unconscionable because of "economic distress," "high pressure tactics[,] and [Defendants'] threatening [Plaintiff] with the loss of his entire investment under the [First Contract]." (Dkt. 11 at 21). Plaintiff's factual assertions of procedural unconscionability relate to the Second Contract as a whole, not the arbitration provision. Plaintiff claims he was forced to sign the Second Contract because Trotter threatened Plaintiff with a loss of his entire investment—to that point, more than $122,000—if Plaintiff did not sign the Second Contract. (Dkt. 1 at 6-8). Taken as true, Plaintiff may assert a sufficient showing of economic duress and high-pressure sales tactics with respect to the Second Contract as a whole. But, Plaintiff has not asserted facts that go towards the arbitration clause in particular. Such a showing is required by the Supreme Court. *See Rent-A-Center*, 561 U.S. at 71.

Plaintiff's procedural unconscionability challenge to the Third Contract similarly fails. Plaintiff argues that Defendants' "high-pressure tactics [coerced] Dr. Eisen into signing the contract. . . ." (Dkt. 11 at 19). Plaintiff's procedural claims vis-à-vis the Third Contract do not focus on the arbitration clause, but, instead, challenge the contract as a whole. Plaintiff has not shown that either of the arbitration clauses themselves was procedurally unconscionable.

New York law allows for a finding of unconscionability, in exceptional cases, even where there was no procedural unconscionability. *Gillman*, 73 N.Y.2d at 12; *Dallas Aerospace, Inc.*, 352 F.3d at 787. Plaintiff argues that this is one of those exceptional cases, and that the arbitration clauses themselves are so substantively unreasonable that they are void. (Dkt. 11 at 17-21). If Plaintiff makes such a showing, he would satisfy *Rent-A-Center*'s requirement that the arbitration clauses themselves be void under contract law, and arbitration would not be compelled.

"Absent substantive unconscionability or fraud . . . , parties are charged with knowing and understanding the contents of documents they knowingly sign." *Horvath v. Banco Comercial Portugues, S.A.*, 461 F. App'x 61, 63 (2d Cir. 2012). Contract terms are substantively unconscionable when they are unreasonably balanced in favor of one party over the other. *Gilman*, 73 N.Y.2d at 10; *see, e.g., Dassero v. Edwards*, 190 F. Supp. 2d 544, 553 (W.D.N.Y. 2002). "There is no general test for measuring the reasonableness of a transaction. . . ." *Sablosky v. Edward S. Gordon Co., Inc.*, 73 N.Y.2d 643, 647 (1989). However, an arbitration clause which equally binds the parties is not substantively unconscionable. *See Nayal v. HIP Network Servs. IPA, Inc.*, 620 F. Supp. 2d 556, 573 (S.D.N.Y. 2009). Examples of terms that are substantively unconscionable include "inflated prices, unfair termination clauses, unfair limitations on consequential damages and improper disclaimers of warranty . . . [and] contract provisions that are oppressive, unjust, and unreasonably deprive a party of the benefits of his or her

bargain." *Day Op of North Nassau, Inc. v. Viola*, 847 N.Y.S.2d 901 (Table), at *6 (N.Y. Sup. Ct. 2007).

There is very little New York caselaw elaborating what an "exceptional case" under *Gillman* requires.  The Appellate Division of the Second Department has found that a case was not "exceptional" where the price charged under the contract was not excessive. *Bianco v. S'holders Commc'n Corp.*, 637 N.Y.S.2d 314, 314 (2d Dep't 1996). A small claims court in New York City found an "exceptional case" where a forum-selection clause in a contract required a party to travel to New York City from California to defend himself if a dispute arose in a contract with a total worth of $2,600. *Lease Fin. Grp. LLC v. Indries*, 29 N.Y.S. 3d 847 (Table), at *5 (N.Y. Ct. Cl. 2015).  There, the purpose of the forum-selection clause was "to increase the likelihood of obtaining a default judgment . . . because of the distance [the defendant] would have to travel and the expense he would incur to travel and stay in New York City as compared to the small amount of money sought." *Id.*  Similarly, a New York Supreme Court found an "exceptional case" where, under the contract at issue, a party benefited from its own breach and caused a forfeiture of the opposing party's contractual benefits. *Day Op of North Nassau, Inc.*, 847 N.Y.S.2d 901, at *7.

Federal caselaw provides little guidance as to what constitutes an "exceptional case" under *Gillman*.  *See Teah v. Macy's Inc.*, No. 11-CV-1356 (CBA)(MDG), 2011 WL 6838151, at *7 (E.D.N.Y. Dec. 29, 2011) (finding that an arbitration agreement which applied equally to both sides did not fall under the "exceptional case" exception);

*Auto Style Leasing Ltd. v. Evans*, No. 92 Civ. 6837, 1995 WL 144812, at *7 (S.D.N.Y. Mar. 31, 1995) (finding that even where a "lease agreement [was] hardly a model of fairness" it did not fall into the exceptional-case exception); *Don King Prod., Inc. v. Douglas*, 742 F. Supp. 778, 781 (S.D.N.Y. 1990) (holding that an exclusive personal services contract of commercial-lifetime duration was not an "exceptional case" under *Gillman*).

Broadly, Plaintiff argues that the terms of both arbitration clauses unreasonably favor Venulum, making each provision substantively unconscionable. (Dkt. 11 at 18-21). In post-oral argument briefing, Defendants waived certain contractual rights under the arbitration clauses. (*See* Dkt. 21 at 3). Specifically, Defendants waived the "potentially unconscionable aspects" of the provision in the Second Contract's arbitration clause which allows Venulum to appoint the sole arbitrator, and the provision in the Third Contract which bars Plaintiff from pursuing any claim against Venulum where its arbitrator is not appointed within six months of the request for arbitration. (*Id.* at 3-4).

New York law allows for parties to waive potentially problematic provisions within arbitration clauses without waiving the entire arbitration clause. *Ragone*, 595 F.3d at 124 ("New York courts have accepted offers by parties to waive the enforcement of certain provisions of arbitration agreements, and have evaluated those agreements as modified by the parties' after-the-fact waivers.") (citing *Brower v. Gateway 2000, Inc.*, 676 N.Y.S.2d 569, 574-75 (1st Dep't 1998)). "Because unconscionability is an equitable defense to the enforcement of harsh or unreasonable contract terms, a party cannot

complain when the defendant through its waivers declines to enforce any potentially unconscionable term." *Id.* (internal citations omitted). Thus, the Court will not consider the provisions waived by Defendants in determining whether the arbitration clauses are unconscionable.

Plaintiff's main argument—beyond his arguments against provisions which have been waived by Defendants—is that both arbitration clauses are unconscionable because the selection of BVI law as the law of arbitration precludes Plaintiff from any protections as an investor under federal or state securities laws. (*See* Dkt. 11 at 15; Dkt. 20 at 1-2). Plaintiff alleges that BVI law precludes the application of federal securities laws, and the "principal reason" for Defendants' desire to arbitrate according to the clauses in the Second and Third Contracts is "to evade United States laws and courts." (Dkt. 20 at 2).

Agreements which provide for arbitration of federal statutory claims are generally permissible. *See Hayes v. Delbert Serv. Corp.*, 811 F.3d 666, 674 (4th Cir. 2016) (collecting cases). Indeed, the Supreme Court has clearly stated that claims under the '33 Act and the '34 Act are subject to binding arbitration where the parties so agree. *Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 239 (1987); *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 480 (1989). However, a court can invalidate an agreement to arbitrate which acts as a "prospective waiver of a party's right to pursue statutory remedies." *Am. Express Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2310 (2013) (original emphasis omitted). "[A] federal court will compel arbitration of a statutory claim only if it is clear that the prospective litigant effectively may vindicate its

- 30 -

statutory cause of action in the arbitral forum, such that the statute under which its claims

are brought will continue to serve both its remedial and deterrent function." *Ragone*, 595

F.3d at 125 (internal citations omitted); *see, e.g., Am. Express*, 133 S. Ct. at 2310; *Hayes*,

811 F.3d at 674 ("[W]hile the Court has affirmed that the FAA gives parties the freedom

to structure arbitration in the way they choose, it has repeatedly cautioned that this

freedom does not extend to a substantive waiver of federally protected civil rights in an

arbitration agreement.") (internal citation omitted).

     In somewhat similar circumstances to those at issue here, a Vermont federal court

found that "an arbitration agreement crafted to preclude federal and state consumer

protections is unenforceable as unconscionable."[8] *Gingras v. Rosette*, Case No. 5:15-cv-

101, 2016 WL 2932163, at *18 (D. Vt. May 18, 2016), *appeals pending*, Nos. 16-2128,

16-2132, 16-2135, 16-2140 (2d Cir.). In that case, the arbitration agreement stated that

---

[8]    The *Gingras* court applied Vermont law on unconscionability. *Gingras v. Rosette*, 2016 WL 2932163, at *15. Vermont law regarding unconscionability is similar to that in New York. "Under Vermont law, terms of a contract may be avoided as unconscionable if they are procedurally or substantively unfair." *Bergman v. Spruce Peak Realty, LLC*, 874 F. Supp. 2d 653, 666 (D. Vt. 2012) (citing *Val Preda Leasing, Inc. v. Rodriguez*, 540 A.2d 648, 651 (1987)). "Unconscionability may be based upon 'evidence of some overreaching on the part of one of the parties such as that which results from an inequality in bargaining power or under other circumstances in which there is an absence of meaningful choice on the part of one of the parties, together with contract terms which are unreasonably favorable to that party.'" *Id.* (quoting *Maglin v. Tschannerl*, 800 A.2d 486, 491 (2002)). "Thus, unequal bargaining power coupled with lack of meaningful choice, plus unreasonably favorable contract terms, may supply grounds for avoiding the terms of a contract on unconscionability grounds." *Id.* (citing *Maglin*, 800 A.2d at 490-91). As in New York, Vermont law does not absolutely require procedural unconscionability to find a contract unconscionable. *Glassford v. BrickKicker*, 35 A.3d 1044, 1049 (2011) ("The superior court was mistaken in assuming that the presence of procedural unconscionability is required to void a contract based on it containing unconscionable terms.").

Native American tribal law was the law of decision in arbitration.  The *Gingras* court stated that the reliance on tribal law would allow "the defendants [to] effectively insulate[] themselves from claims that they have violated state and federal lending laws." *Id.*

Here, similarly, Defendants have attempted to use BVI law to avoid the requirements of federal securities laws.  *See, e.g., Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 676 (4th Cir. 2016) ("[R]ather than use arbitration as a just and efficient means of dispute resolution, [the defendant] seeks to deploy it to avoid state and federal law and to game the entire system.").  Defendants argue that Plaintiff's assertion that the arbitration clauses allow them to avoid federal securities laws is "simply untrue."  (Dkt. 13 at 9).  However, Defendants fail to assert that federal securities laws could be applied by an arbitrator acting according to BVI law; in response to Plaintiff's allegation, Defendants only state that Plaintiff signed the agreements knowing that arbitration was required, and that ICC rules require an arbitrator to be impartial.  (*See id.* at 9-10).

The "arbitration agreement fails for the fundamental reason that it purports to renounce wholesale the application of any federal law to the plaintiffs' federal claims." *Hayes*, 811 F.3d at 673; *see, e.g., Gingras*, 2016 WL 2932163, at *18.  Although Defendants are correct that "[t]here is no limitation under . . . federal case law that limits an arbitration panel in the [BVI] from adjudicating" securities claims, under the terms of the contracts, the panel would apply BVI, and not federal securities law to Plaintiff's federal securities law claims. (*See id.* at 8).  Plaintiff must be able to effectively vindicate

his federal rights in the arbitration forum selected under the investment contracts. *See Am. Express*, 133 S. Ct. at 2310. The arbitration clauses in the Second and Third Contracts require Plaintiff—through submission of his federal securities claims to arbitration applying BVI law—to forgo any application of the federal law protections provided to him. In other words, Defendants, who have, according to Plaintiff's allegations, repeatedly run afoul of federal and state securities laws resulting in repeated admonishments by regulatory authorities, could nonetheless insulate themselves from the protections and remedies provided by these securities laws for their conduct in the United States with a U.S. investor by compelling arbitration in the BVI applying the law of the BVI. This makes the arbitration clauses of the Second and Third Contracts unconscionable and void as against public policy. *See Ragone*, 595 F.3d at 125 ("[I]f certain terms of an arbitration agreement served to act as a prospective waiver of a party's right to pursue statutory remedies, we would have little hesitation in condemning the agreement as against public policy.") (internal citations omitted); *Hayes*, 811 F.3d at 673-74 ("[The defendant] seeks to avoid federal law through the prospective waiver of federal law provision found in the arbitration agreement. But that provision is simply unenforceable. . . . The just and efficient system of arbitration intended by Congress when it passed the FAA may not play host to this sort of farce."). As a result, the Court cannot compel Plaintiff to arbitrate his claims pursuant to the Second and Third Contracts' arbitration clauses, and this action may proceed in this forum.

## IV.    Conclusion

For the foregoing reasons, Defendants' motion to compel arbitration (Dkt. 7) is denied.

SO ORDERED.

_____
ELIZABETH A. WOLFORD
United States District Judge

Dated:  March 27, 2017
          Rochester, New York

- 34 -