**IN THE UNITED STATES DISTRICT COURT**

**FOR THE WESTERN DISTRICT OF NEW YORK**

_____

Bernard M. Eisen, DDS

Plaintiff,

    vs.                             Civil Action No. 1:16-cv-461-EAW

Venulum Ltd., Giles Cadman, Individually,      Jury Trial Demanded

Mark Trotter, Individually and Phillip Serrien,

Individually,

Defendants.

_____

### <u>AMENDED COMPLAINT</u>

Plaintiff, Dr. Bernard M. Eisen, by and through his counsel, Kavinoky Cook LLP, for his Complaint against Defendants Venulum Ltd. ("Venulum"), Giles Cadman ("Cadman"), Mark Trotter ("Trotter") and Phillip Serrien ("Serrien") (collectively the "Defendants"), herein alleges as follows.

### <u>PARTIES</u>

1.      The Plaintiff is an individual currently residing, and at all relevant times has resided, in Williamsville, New York.

2.      Upon information and belief, Defendant Venulum is, and was at all times mentioned, a corporation organized and existing under the laws of the British Virgin Islands, having a principal place of business in Toronto, Ontario.

3.      Upon information and belief, at all relevant times, Venulum was established to sell investment contracts relating to the purchase, storage and re-sale of fine wines.

4.      Upon information and belief, Defendant Cadman is, and was at all times mentioned, an individual residing within the United Kingdom.

5.      Upon information and belief, Cadman was at all relevant times a principal of Defendant Venulum.

6.      Upon information and belief, Defendant Trotter is, and was at all times mentioned, an individual residing within the Province of Ontario, Canada.

7.      Upon information and belief, Trotter was at all relevant times an employee or agent of Defendant Venulum.

8.      Upon information and belief, Defendant Serrien is, and was at all times mentioned, an individual residing within the Province of Ontario, Canada.

9.      Upon information and belief, Serrien was at all relevant times an employee or agent of Defendant Venulum.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Securities Exchange Act of 1934, as amended (15 U.S.C. §78(a) *et seq*.) and 28 U.S.C. §§ 1331 and 1332. This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

11.     Venue properly lies in this Court pursuant to Section 27 of the Securities Exchange Act and is proper pursuant to 28 U.S.C. §1391 because, among other things, a substantial part of the events, misleading statements or omissions giving rise to these claims occurred in this district.

12.     In connection with the wrongful acts and conduct alleged herein, Defendants, either directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States Mail and interstate telephone communications.

13.     All of the phone calls made by Serrien and Trotter to Plaintiff originated in Canada.

14.     By contacting Plaintiff at his home in Williamsville, New York by telephone and United State Mail over a sustained period of time and for the purpose of selling securities, Defendants were doing business in New York.

### FACTS

15.     Beginning in 2007, and continuing through September of 2008, Plaintiff received frequent telephone calls, at night, at his home in Williamsville, New York, first from Alun Williams and then from Defendant Serrien in Ontario, Canada, offering for sale to Plaintiff wine investments sponsored by Defendant, Venulum.

16.     During these telephone calls Serrien represented to the Plaintiff that he could make a purchase of wine through Venulum using a credit card number which could be given over the telephone.

17.     Serrien represented to the Plaintiff that Venulum was in the wine business, possessed a high degree of experience and sophistication in the selection of wines that had potential to appreciate in value, and that Venulum was able to acquire such wines and sell them on behalf of the Plaintiff at a profit to the Plaintiff.

18.     Serrien reiterated these claims in frequent telephone calls to the Plaintiff.

19.     Serrien represented to Plaintiff that he would make an 8% return on his investment almost immediately if he purchased wine through Venulum.

20.     In or around 2007, during a telephone call from Serrien, Plaintiff finally agreed to make a small trial investment, and gave to Serrien a credit card number and authorized Venulum to charge $1,000 to purchase wine on Plaintiff's behalf.

21.     Shortly thereafter, Serrien reported to Plaintiff that Venulum had purchased and sold wine on his behalf and that he had made a profit of approximately 8%.

22.     Defendant Serrien continued to urge Plaintiff, in subsequent telephone calls, to authorize additional investments.

23.     Serrien told the Plaintiff specifically that he could liquidate his investment at any time upon ten (10) days' prior notice to Venulum and that upon such notice he would receive the entire amount of his investment plus his return, sent to him by check.

24.     Serrien indicated that Plaintiff could give notice of his desire to liquidate his investment simply by informing Serrien by telephone.

25.     During this period in 2008 and through 2009, Serrien and Plaintiff spoke regularly and Plaintiff continued to expend funds to buy wine through Venulum.

26.     Based upon assurances from Serrien and what Plaintiff believed was a true business relationship in which Serrien was acting as a representative of a legitimate business, Plaintiff agreed to make further investments with Venulum, and authorized Serrien to use his credit card.

27.     At one point, Serrien called the Plaintiff and reported that his approximately $5,000 investment was then worth approximately $12,000.

28.     During this time, Plaintiff never received a written statement of the fair market value of his account.

29.     Venulum mailed to Plaintiff, from time to time, statements purporting to confirm a "deposit" on what appeared to be fractional interests in cases of wine, together with a statement of the "control value" of the wine (the meaning of which is unknown) and the "installment amount" presumably to be paid to complete the purchase of the specified wine (although this also is unclear).  Examples of such statements are provided as Exhibit A.

30.     While the true nature of the investment presented by Venulum is not clear, it appears to resemble an installment contract for the purchase of cases of wine, presumably held by Venulum or an affiliate of Venulum.

31.     There was no disclosure to the Plaintiff of the criteria Venulum used to evaluate the suitability of potential investments, how the wine was sourced or where the wine purchased on Plaintiff's behalf was to be physically stored.  Further, there was no disclosure regarding how the wine would be sold on Plaintiff's behalf, how the selling price would be determined or to whom it would be sold.

32.     There was no disclosure as to how Serrien or Venulum profited from the investments made by Plaintiff or the amount of compensation or commission they took from Plaintiff's investments or otherwise derived from Plaintiff's investments.

33.     On October 7, 2008, at the request of Serrien the Plaintiff entered into Purchase Contract No. 15066 with Venulum (Purchase Contract No. 15066 and the "Venulum Ltd. Account Opening Form and Terms and Conditions" are referred to herein as the "First Investment Contract").  A copy is annexed hereto as Exhibit B.

34.     The arrangement contemplated that unless Plaintiff requested his money (which he believed he could do at any time) profits from the sale of wine purchased by Plaintiff would be reinvested in additional purchases of wine.

35.     However, Plaintiff was led to understand, and relied on Serrien's statements that, Plaintiff's investment could be fully liquidated at any time by Plaintiff's simply requesting liquidation over the telephone to Serrien.

36.     Between October 7, 2008 and March 16, 2010, the Plaintiff invested approximately $122,480.64 under the First Investment Contract.

37.     Plaintiff was told that the wine he had purchased was warehoused in the British Virgin Islands or in England.

38.     In early 2010, the Plaintiff informed Serrien that he wished to liquidate his investment with Venulum.

39.     Following Plaintiff's request to liquidate his investment, Serrien ceased his calls to the Plaintiff and Defendant Trotter began contacting Plaintiff.

40.     Trotter informed Plaintiff that he could take delivery of "his wine," provided that he pay for the shipping and handling, but that he could not receive his money back or liquidate his account.

41.     This was the first indication that Serrien had misrepresented the terms under which the Plaintiff was making investments and the first indication that Plaintiff could not get his money back.

42.     Trotter later told Plaintiff that he could liquidate his account after a period of time, but that first he had to enter into a second investment contract.

43.     Trotter continued the pattern of calling Plaintiff at his home at night, pursuing his signature on the second investment contract.

44.     Plaintiff finally signed the second investment contract dated as of March 16, 2010 (the "Second Investment Contract"), a copy of which is annexed hereto as Exhibit C.

45.     Trotter's tactics in this process included threats that Plaintiff would lose all or substantially all of his investment of $122,480 if he did not continue with the wine purchasing scheme under the Second Investment Contract.

46.     The Second Investment Contract contained a provision requiring Plaintiff to submit any dispute with Venulum to arbitration in the British Virgin Islands before an arbitrator of Venulum's sole choosing.

47.     The arbitration provision in the Second Investment Contract, by its terms, preempted any action by Plaintiff in any court in the United States or even in the British Virgin Islands.

48.     Plaintiff was led to believe he had no choice but to continue the investment program or lose his entire investment as of that time.

49.     This belief was based in part on his literal reading of the preemptive arbitration clause in the Second Investment Contract.

50.     Plaintiff was told by Trotter, that the $122,480 he had invested at that point would be applied as a "credit" against his commitment to continue his investment under the Second Investment Contract.

51.     Plaintiff was further led to believe that the Second Investment Contract called for an additional $100,000 investment and that upon funding such additional $100,000, Plaintiff would then have satisfied the terms of the Second Investment Contract and would be entitled to the return of his $122,480 "credit" and that he would also have $100,000 in wine with Venulum which would appreciate and pay a return upon their sale.

52.     While the Second Investment Contract, as discussed between Plaintiff and Trotter, called for Plaintiff to invest an additional $10,000 per year over a ten year period, Plaintiff

accelerated the payment of the additional $100,000 in order to end his relationship with Venulum sooner and receive the return of his $122,480 "credit."

53.     With no apparent recourse against the foreign Defendants, facing a total loss of his $122,480 investment and wishing to end his relationship with Venulum as quickly as possible, Plaintiff funded the next $100,000 under the Second Investment Contract in only four years.

54.     Venulum never provided to Plaintiff statements reflecting the fair market value of Plaintiff's account or the timing of the investments.

55.     Around this time, Plaintiff received an invitation to attend a Venulum event at the Greenbrier Resort in West Virginia.

56.     At this event, the Plaintiff met Defendant Cadman personally and discussed with Cadman his investment in Venulum.

57.     On February 15, 2012, the Securities and Exchange Commission (the "SEC") charged Venulum and Defendant Giles Cadman with violations of the Securities Act of 1933, as amended (the "Securities Act") in connection with the unregistered offer and sale of securities, including wine purchase contracts.

58.     The SEC alleged, among other things, that Venulum, through its representatives, made unsolicited calls to US investors, primarily dentists, to solicit interests in trading in fine wines to be managed by Venulum and failed to register this offering in accordance with Section 5 of the Securities Act.

59.     On or about February 27, 2012, Venulum entered into a consent order which permanently enjoined it from future violations of the Securities Act (the "2012 SEC Consent Order").  A copy of the Consent Order is annexed hereto as Exhibit D.

60.     The Consent Order enjoined Venulum and Cadman against further violations of

Section 5(a) and 5(c) of the Securities Act, which is the sale of securities without an exemption

from registration under the Securities Act.

61.     Following the entry of the 2012 SEC Consent Order, Venulum entered into

similar consent orders with several State securities regulators (collectively referred to herein as

the "State Consent Orders").

62.     On September 25, 2013, the Securities Commissioner of South Carolina entered a

final order in which Defendant Venulum agreed to refrain from future violations of South

Carolina securities laws (the "South Carolina Order") governing the sale of securities absent the

required registration or an exemption from such registration. A copy of the South Carolina Order

is annexed hereto as Exhibit E.

63.     On September 30, 2013, the Oregon Department of Consumer and Business

Services, Division of Finance and Corporate Securities, entered a final order enjoining

Defendants Venulum and Cadman from future violations of Oregon securities law (the "Oregon

Order").  A copy of the Oregon Order is annexed hereto as Exhibit F.

64.     In September of 2013, the Wisconsin Department of Financial Institutions

initiated a regulatory inquiry related to the conduct of Venulum cited in the SEC Consent Order.

65.     Upon information and belief, and based upon public information available on

Wisconsin Department of Financial Institutions' web site, the matter is still pending or its

conclusion has not been disclosed.

66.     Upon information and belief, Defendant Cadman's prior investment program,

known as "Architects of Wine, Ltd," was the subject of an Order of the Arkansas Securities

Department dated March 4, 2004, enjoining the sale of securities in Arkansas without

registration or an exemption from registration (the "Arkansas Order"), a copy of which is annexed hereto as Exhibit G.

67.    The Arkansas Order states that the parties named "all have a long regulatory history in which several state securities regulators found that securities were sold without registration or exemptions from registration and/or sold by persons who were not registered as brokers.

68.    In January 1998 Defendant Trotter was the subject of an Order of Prohibition of the Wisconsin Securities Commission in 1998 prohibiting him from selling securities in Wisconsin without registration or an exemption from registration as a result of his activities as an agent of Heros Global Marketing Services B.V., Churchill Portfolio Management (a Cayman Islands business entity) and HGM Offshore Securities Company (the "Trotter Wisconsin Order") a copy of which is annexed hereto as Exhibit H.

69.    Upon information and belief, the Arkansas Order, which names Cadman's former business, "Architects of Wine," also cited Trotter's former business, Heros Global Marketing Services, B.V. in the following list of related matters cited in the Arkansas Order.

a.    *In the Matter of Heros Global Marketing Services B.V., et al.*, No. S-97047(EX); Summary Order of Prohibition; Wisconsin Department of Financial Institutions, Division of Securities, issued on 2 February 1998; wine programs found to be investment contracts, which were unregistered securities being sold by unregistered individuals and entities.

b.    *In the Matter of Heros Global Marketing Services B.V., Daniel Bartlett and Churchhill Associates Ltd.*; Cease and Desist Order; Iowa Division of Insurance, Superintendent of Securities; issued on 16 August 2000; wine programs found to be investment contracts, which were unregistered securities being sold by unregistered individuals and entities.

c.    *In the Matter of Ocean International Marketing, Ltd., and Seed International, Ltd.*, No. C03-06-504; Cease and Desist Order; Iowa Division of Insurance, Superintendent of Securities; issued on 11 July 2003; wine programs found to be investment contracts, which were unregistered securities being sold by

unregistered individuals and entities; Ocean and Seed found to have been in violation of previous order against them when known as Heros and Churchhill, respectively

d.   *In the Matter of Seed International, Limited; Ocean International Marketing; et al.*; North Dakota Securities Commissioner; Cease and Desist Order; issued 19 March 2003; wine programs found to be investment contracts, which were unregistered securities being sold by unregistered individuals and entities

e.   *In the Matter of Ocean International Marketing, Ltd., Heros Global Marketing, Ltd., Seed International, Ltd., GFH International, George and Jane Doe Ioannou and Ryan and Jane Doe Ferreira,* No. S-03526A-03-0000; Default Order to Cease and Desist, Order for Restitution and Order for Administrative Penalties; Arizona Corporation Commission; temporary cease and desist order issued on 15 April 2003, permanent order issued on 14 October 2003; wine programs found to be investment contracts, which were unregistered securities being sold by unregistered individuals and entities, and fraud by omission and commission was found

f.   *In the Matter of Ocean International Marketing, Ltd., Seed International, Ltd.*, No. 2002E052; Kansas Securities Commissioner; Notice of Intent to Issue Permanent Cease and Desist Order issued on 13 May 2003; Permanent Cease and Desist Order issued on 6 November 2003; wine programs found to be investment contracts, which were unregistered securities being sold by unregistered individuals and entities.

g.   *In the Matter of Seed International, Ltd., and Ocean International Marketing, Ltd.*, No. S-03-0132; Mississippi Secretary of State, Business Regulation and Enforcement Division; Summary Cease and Desist Order issued on 27 June 2003; Final Cease and Desist Order issued on 29 October 2003.

70.   The foregoing matters referenced in paragraphs "a" through "g" are referred to herein collectively as the "Related State Orders."

71.   Upon information and belief, and based upon the Arkansas Order, the Trotter Wisconsin Order and the Related State Orders cited in the Arkansas Order, Defendants Trotter and Cadman have been the subject of regulatory actions as far back as 1998 in what appears to be the same or similar businesses of marketing investment contracts for the purchase and sale of wine using offshore entities and evading securities laws.

72.     Effective September 23, 2013, the so-called "Bad Boy" provisions of Regulation D ("Regulation D") were promulgated under the Securities Act of 1933.  These Bad Boy provisions established certain "disqualifying events" that render an offering of securities ineligible to be conducted pursuant to Rule 506 of Regulation D.  Disqualifying events included where an issuer or its affiliates ("covered persons") had been subject to a final order enjoining or restraining such covered persons from engaging or continuing to engage in any conduct or practice with the purchase or sale of any security. The Rule further required that issuers disclose disqualifying events occurring prior to September 23, 2013 to investors reasonably in advance of a Rule 506 offering of securities.

73.     Upon information and belief, the South Carolina Order (Exhibit E herein) was a disqualifying event that made the offering of Securities conducted by Venulum on or after September 23, 2013 ineligible to be conducted under Rule 506 of Regulation D.

74.     As a result of the "Bad Boy" provisions of Regulation D going into effect, the prior 2012 SEC Consent Order (Exhibit D herein) and the South Carolina Consent Order (Exhibit E herein) both were required to be disclosed to investors, including Plaintiff herein, in connection with any sale of securities by Venulum on or after September 23, 2013.

75.     Also as a result of the "Bad Boy" provisions and the entry of the South Carolina Consent Order after the effective date of such "Bad Boy" provisions, Defendants ceased to be eligible to use Rule 506 of Regulation D.  Venulum's Form D filings with the SEC indicate that it relied on Rule 506 after the effective date of the "Bad Boy" provisions.

76.     Upon information and belief, at all relevant times, none of Defendants Cadman, Trotter or Serrien were registered as broker-dealers in accordance with Section 15(a) of the Securities Exchange Act of 1934, as amended (the "Exchange Act").

77.     Notwithstanding, each of Defendants Cadman, Serrien and Trotter entered the United States for the purpose of selling securities, without a license or registration to do so.

78.     While Defendants were marketing the Venulum securities, they had the benefit of legal counsel with expertise in the securities laws and could not have been unaware of the broker-dealer registration requirements in the United States, nor could they have reasonably believed they were exempt from such requirements.

79.     Plaintiff first became aware of the SEC Consent Order in October of 2013.

80.     Upon learning of the SEC Consent Order, Plaintiff e-mailed Trotter and requested a return of his money and the liquidation of his account with Venulum.

81.     Trotter responded by telling Plaintiff that he now had to enter into a third investment contract (the "Third Investment Contract") that would "tidy up" the terms of his investment. A copy of the Third Investment Contract is annexed hereto as Exhibit I.

82.     Trotter insisted that the Third Investment Contract did not materially change the deal that Plaintiff had with Venulum.

83.     Again, Trotter threatened the complete loss of Plaintiff's investment, which at the time was over $200,000.

84.     The Plaintiff was told that the Third Investment Contract had to be executed immediately.

85.     Contrary to Trotter's representations, the Third Investment Contract expanded the terms of the Second Investment Contract, and included terms and conditions that did not exist in the Second Investment Contract.

86.     On October 3, 2013, under the extreme duress of losing his entire investment, the Plaintiff was coerced into entering into the Third Investment Contract with Venulum, which

replaced the First Investment Contract and the Second Investment Contract in their entirety and continued the investment contract that was begun over the telephone in 2008.

87.     The Third Investment Contract explicitly contemplates that Venulum, through its authorized representatives would (i) select wines for investment, (ii) acquire such wines at market on behalf of investors, (iii) store the wine so purchased, and (iv) liquidate the wine at a profit through commercial wine channels.

88.     The Third Investment Contract (like its predecessors) contains no indication as to the source of wines to be purchased or the potential buyers for such wines.

89.     In particular, the Third Investment Contract contains no limitation on purchasing or selling wines from or to affiliates of Venulum, as would commonly be the case in investment programs where the sponsor or manager is in the same business as the investment program.

90.     The Third Investment Contract also authorizes Venulum to charge a mark-up on wines sold to Plaintiff's account, but does not specify the amount of the mark-up or limit the mark-up.

91.     Pursuant to the Third Investment Contract, the purchases of wine for Plaintiff's account could (a) be purchased from an affiliate of Venulum (there is no prohibition on related party transactions in the contract), (b) would include an unspecified mark-up which would be taken by Venulum presumably as compensation for arranging the transaction and (c) the aggregate purchase price (including the mark-up taken by Venulum) would become the base amount on which Venulum's 2% annual management fee would be charged.

92.     Plaintiff has never received disclosure itemizing the fees and mark-ups taken by Venulum, nor does Plaintiff have any disclosure as to the source of the wines he is said to have purchased.

93.     Plaintiff has no disclosure as to the buyer or potential buyer of the wines held in his account, which may be affiliates of Venulum, or Venulum itself.

94.     While the mark-up is compensation to Venulum, it is included in the "purchase price" of the wine on which the annual management 2% fee paid to Venulum is calculated.

95.     Management fees, as provided in Section 4.2 of the Third Investment Contract, are deducted from the proceeds of the sale of wine, which can occur at any time in the discretion of Venulum.

96.     The Third Investment Contract does not prohibit or limit related party transactions.  As a result, Venulum could purchase wine from one of its affiliates[1] at a price that is not determined by the market, and could arbitrarily then mark-up that price.

97.     Section 7.4 of the Third Investment Contract provides that,  if a "Contractholder" (such as the Plaintiff) fails to make a deposit or an installment payment, then as liquidated damages Venulum is entitled to retain all prior payments.

98.     In the case of Plaintiff, this provision in Section 7.4 appears to give Venulum the right to keep in excess of $200,000 because Plaintiff was unable or unwilling to continue funding the Contract.

99.     This position, articulated in Section 7.4 of the Third Investment Contract is consistent with the pressure tactics used by the Defendants to obtain Plaintiff's signature and is the reason that Plaintiff continued to fund the Venulum contract.

100.    Under Section 2.1 of the Third Investment Contract, Venulum recommends a "Holding Period" of up to 7 years for wine, during which time the wine is expected to appreciate.

---

[1] Upon information and belief, Defendant Cadman is the principal of several other fine wine enterprises, including Vinculum Wine Fund Ltd. (f/k/a International Wine Fund Ltd.), an investment fund focusing on fine wines; Cadman Fine Wines, an online-only wine retailer based in the UK; and Golden West Wine, an on-line only wine retailer based in San Francisco, California.

101.    Section 11.1 of the Third Investment Contract states Venulum relied on the private placement exemption from registration afforded by Rule 506 of Regulation D.

102.    At no time were the 2012 SEC Consent Order or the State Consent Orders or the Related State Orders disclosed to the Plaintiff in connection with the offering of, and the acceptance of, the Third Investment Contract.

103.    On or about July 24, 2015 the Plaintiff received a letter (the "LCB Letter") from London City Bond ("LCB"), a wine storage facility located in the United Kingdom, enquiring as to a storage account that was opened on his behalf that had yet to receive any wine.

104.    The LCB Letter assessed a charge for storage of wine, notwithstanding that it also stated that it was not holding any wine for the benefit of Plaintiff.

105.    Upon receipt of the LCB Letter, the Plaintiff asked Defendant Trotter where his wine holdings were physically located, and was told that they were being stored "somewhere."

106.    In May, 2016 Plaintiff received a statement from LCB charging him for an additional storage fee for wine purportedly held by LCB. This statement does not specify how many cases of wine (if any) are being stored by LCB on Plaintiff's behalf.

107.    In the nearly 10 years that Plaintiff has interacted with Venulum, Plaintiff has never received, or been offered, any third-party confirmation of Venulum's representations as to its wine holdings, storage, financial condition or the use of Plaintiff's funds.

108.    There has been no disclosure of (a) the fees paid to Venulum, (b) the mark-ups on wine purchased for Plaintiff's account (if any wine has actually been purchased), (c) the costs and expenses charged against Plaintiff's account or (d) the identity of the sellers of wine into the account or the buyers of wine from the account.

## COUNT I

## <u>VIOLATIONS OF SECTION 10(b) OF THE SECURITIES EXCHANGE ACT OF 1934 [15 U.S.C. 78j(b)] AND SEC RULE 10b-5</u>

109.     The Plaintiff repeats and realleges as though fully set forth herein each of the allegations set forth in paragraphs 1 through 108.

110.     In violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, Defendants, in connection with the First Investment Contract, Second Investment Contract and Third Investment Contract, by use of the means and instrumentalities of interstate commerce and of the mails, employed one or more device, scheme or artifice to defraud the Plaintiff; omitted to state one or more material facts to the Plaintiff necessary in order to make the statements made, in the light of the circumstances which they were made, not false and misleading; and engaged in other acts, practices or courses of business which operated to defraud and deceive the Plaintiff, all to his financial harm.

111.     Defendants did not disclose, as required, the SEC Consent Order, the State Consent Orders or the Related State Orders entered against them or firms they were affiliated with (collectively, the "Orders") at the time they induced Plaintiff to enter into the Third Investment Contract.

112.     The existence of the Orders was a material fact reflecting on the integrity of the Defendants and the legitimacy of the Venulum investment program that would have materially influenced the Plaintiff's decisions to enter into the Third Investment Contract and to fund the investments in wine at every step.

113.     Defendants' misrepresentations and omissions were intended solely to deceive, and did in fact deceive, the Plaintiff, for the purpose of causing the Plaintiff to invest in the contracts.

114.     More specifically, Defendants failed to disclose material points of the investment arrangement that were necessary and material to the terms of the Third Investment Contract, including (a) the mark-ups to be charged when wine was purchased, (b) whether the wine could be purchased from affiliates of Venulum or Venulum itself and how the price would be determined, (c) the costs of holding the wine, (d) whether wine could be sold to affiliates of Venulum or Venulum itself and how the sales price would be determined, and (e) clear disclosure that the 2% annual management fee would be based upon the marked up purchase price of the wine instead of the fair market value of the wine.

115.     Venulum has never provided any financial statements to Plaintiff, though requested to do so.

116.     Because Venulum used unregistered, unlicensed brokers to sell the securities at issue, there has been no independent due diligence that would otherwise be required to be performed by an independent, registered broker.

117.     Because Venulum used unregistered, unlicensed brokers to sell the securities at issue, there was no assessment of the suitability of this investment for Plaintiff, as was required.

118.     In fact, the investment on its face (if it is a legitimate investment) is wholly unsuitable for Plaintiff because it requires a ten-year pay-in period before assets (if any) are liquidated and funds are paid out.

119.     Plaintiff is 63 years old.

120.     Any investment product that does not pay a return for ten years is, by its terms, wholly unsuitable for a 63 year old investor.

121.     Defendants owed the Plaintiff a duty not to withhold, or to misrepresent, material facts regarding his investment under Section 10(b) of the Exchange Act and Rule 10b-5

promulgated thereunder. Despite this duty, Defendants made those misrepresentations and omissions knowingly, with the intent to deceive and defraud the Plaintiffs, and with reckless disregard for the truth and materiality thereof, for the sole purpose of inducing the Plaintiff to give substantial sums of money to the Defendants.

122.    Each of the material misrepresentations and/or omissions of fact alleged above was material and the Plaintiff, or any similarly situated investor, would have considered the facts as set forth above to be of material importance in deciding whether or not to enter into the Investment Contracts.

123.    Unbeknownst to the Plaintiff, at all times material hereto, the investments recommended by the Defendants served to benefit Defendants' interests alone, at the expense of the Plaintiff's interests, in contradiction of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

124.    As a direct, proximate, and foreseeable consequence of Defendants' misrepresentations, nondisclosures, and omissions, the Plaintiff entered into the Investment Contracts that were promoted by Defendants, which caused the Plaintiff to suffer extensive monetary damages.

## COUNT II

## VIOLATIONS OF SECTION 15 OF THE SECURITIES EXCHANGE ACT OF 1934

125.    The Plaintiff repeats and realleges as though fully set forth herein each of the allegations set forth in paragraphs 1 through 124.

126.    Defendants Cadman, Trotter and Serrien engaged in the interstate business of effecting securities transactions for the account of another, without being registered with the

Securities Exchange Commission as a broker or dealer, in violation of Section 15(a) of the Exchange Act.

127.    Defendants Cadman, Trotter and Serrien engaged in the interstate business of selling securities, an activity that fits squarely within any definition of the business of a "broker."

128.    Section 15(a) of the Exchange Act requires broker-dealers to register with the SEC.

129.    Section 15(b)(8) of the Exchange Act requires that all registered broker-dealers be members of a qualifying self-regulatory organization which today is Financial Industry Regulatory Authority ("FINRA").

130.    Articles 23-A, Sections 359-e and 359-f of New York State's General Business Law require that broker-dealers doing business in the State of New York register with the New York State Department of Law.

131.    FINRA Conduct Rule 2110, which encompasses a broker-dealer's business related conduct generally (even if securities are not involved in a particular transaction) mandates "just and equitable" standards of business conduct.

132.    FINRA Rule 2111 requires that broker-dealers effecting private placements of securities conduct their own independent due diligence with respect to the offering.  Because Defendants Cadman, Trotter and Serrien are unlicensed brokers acting outside any regulatory scheme in the United States, there has been no independent due diligence that would otherwise be required to be performed by an independent, registered broker.

133.    FINRA Conduct Rule 2310 provides that a broker-dealer may not recommend a security unless he has reason to believe the security is "suitable" to the investor's financial situation and needs.

134.    As unlicensed brokers acting outside any regulatory scheme in the United States, Defendants Cadman, Trotter and Serrien pressed upon the Plaintiff, a 63-year old man, a wholly unsuitable "investment" that requires a ten-year pay-in period before assets (if any) are liquidated and funds are paid out.

135.    Plaintiff had planned to retire in two years.

136.    Disclosure of sales related compensation is required under FINRA Rule 2124.

137.    The Defendants Cadman, Trotter and Serrien never disclosed the sales related compensation they received in connection with the sale of securities to Plaintiff.

138.    As a result, Plaintiff was unable to determine whether such compensation exceeds FINRA guidelines for broker-dealer compensation in connection with the private placement of securities.

139.    Defendant Cadman is also a principal of an investment advisory firm, Venulum Capital, which is registered in the British Virgin Islands and has filed with the SEC for an exemption from registration as an investment advisor in the United States.

140.    As the principal of an investment advisor, Defendant cannot claim the exemption from registration as a broker that is potentially afforded to principals of an issuer under Rule 3a4-1 promulgated under the Securities Exchange Act of 1934.

141.    Broker-dealers in the United States owe their clients a "duty of fair dealing."

142.    As of April 6, 2016, broker-dealers in the United States owe their clients a fiduciary duty.

143.    Section 29(b) of the Exchange Act, permits for the rescission of a contract if the contract violates any provision of the Exchange Act or regulations promulgated thereunder.

Accordingly, the Plaintiff is entitled to rescind each of the Investment Contracts and to full repayment of all amounts paid by him thereunder.

## COUNT III

## VIOLATION OF SECTION 5 OF THE SECURITIES ACT OF 1933, AS AMENDED

144.    The Plaintiff repeats and re-alleges as though fully set forth herein each of the allegations set forth in paragraphs 1 through 143.

145.    Defendants, by engaging in the conduct described above, directly or indirectly, made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

146.    No registration statement has been filed with the Securities and Exchange Commission, nor has any been in effect with respect to any of the offerings or sales of securities alleged herein.

147.    As further alleged herein, a result of the Defendants' failure to disclose the Consent Orders to the Plaintiff,  Defendant Venulum was not entitled to rely on the "private offering" exemption from registration afforded by Rule 506 of Regulation D promulgated under the Securities Act.

148.    In order to rely on the Rule 506 exemption from registration afforded by Regulation D, issuers must, among other things, disclose any and all consent orders entered into with the SEC and other securities regulators during the five years preceding the enactment of the "bad boy" regulations. . Rule 506(d)(1)(v).

149.     Venulum did not disclose the Consent Orders to the Plaintiff in connection with Third Investment Contract and the offering and sale of securities thereunder.

150.     By failing to disclose the Consent Orders to Plaintiff, Venulum did not meet the requirements of Regulation D in offering the securities to the Plaintiff under the Third Investment Contract and had no exemption for the sale of securities.

151.     Further, because the South Carolina Consent Order and the Oregon Consent Order each constituted a disqualifying event occurring on or after September 23, 2013, Venulum is prohibited from relying on the Rule 506 exemption afforded under Regulation D.

152.     As a result, Venulum offered and sold unregistered securities to Plaintiff without an exemption from registration under the Securities Act.

153.     Defendant Venulum is liable to the Plaintiff for the consideration paid by the Plaintiff for the Third Investment Contract, with interest thereon.

## COUNT IV

## VIOLATION OF SECTION 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934

154.     The Plaintiff repeats and re-alleges as though fully set forth herein each of the allegations set forth in paragraphs 1 through 153.

155.     Defendants Venulum and Cadman exercised authority and control over Defendants Trotter and Serrien's actions, for which acts Defendants Venulum and Cadman are liable.

156.     Defendants Trotter and Serrien are individuals liable under Sections 10(b) and 15(a) of the Exchange Act, as specified in Counts I and II.

157.     Defendants Venulum and Cadman had the power and authority to control Defendants Trotter and Serrien with respect to the wrongful conduct complained of herein and failed to do so.

158.     By reason of Defendants Venulum and Cadman's conduct, both are jointly and severally liable pursuant to Section 20(a) of the Securities Exchange Act for the damages arising from Count 1 above.

## COUNT V

## UNCONSCIONABLE CONTRACT PURSUANT TO NEW YORK UNIFORM COMMERCIAL CODE SECTION 2-302.

159.     The Plaintiff repeats and re-alleges as if fully set forth herein each of the allegations contained in Paragraphs 1 through 158.

160.     Section 2-302(2) of the New York Uniform Commercial Code states that, "When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination."

161.     By reason of the Defendants' conduct as recited herein, the Third Investment Contract represents an unconscionable contract.

162.     Venulum used the threat of forfeiture of Plaintiff's entire investment as leverage to induce Plaintiff to enter into the Third Investment Contract.

163.     Venulum pressured Plaintiff using artificial, arbitrary and unreasonable deadlines to sign the Third Investment Contract quickly.

164.     Venulum refused all efforts to modify the Third Investment Contract, effectively creating a contract of adhesion on threat Plaintiff's forfeiture of his entire prior investment.

165.    The Third Investment Contract is unconscionable because (a) Defendant Venulum used oppression and intimidation to coerce the Plaintiff into enter into the Third Investment Contract, and (b) Defendant Venulum, the custodian of the wines purchased by the Plaintiff, threatened the Plaintiff with the loss of his investment which Venulum controlled entirely, thereby creating a disparity of bargaining power.

166.    Section 7.4 of the Third Investment Contract calls for the total forfeiture of all amounts invested by Plaintiff in the event of a failure to continue funding.

167.    Such a forfeiture provision is void as against public policy.

168.    The Third Investment Contract fails to disclose material points of the investment arrangement that are necessary and material to the terms of the Third Investment Contract to a point that is simply deceptive.

169.    These points include: (a) the mark-ups to be charged when wine was purchased, (b) whether the wine could be purchased from affiliates of Venulum or Venulum itself and how the price would be determined, (c) the costs of holding the wine, (d) whether wine could be sold to affiliates of Venulum or Venulum itself and how the sales price would be determined, and (e) clear disclosure that the 2% annual management fee would be based upon the marked up purchase price of the wine instead of the fair market value of the wine.

170.    Section 8.1 of the Third Investment Contract provides that either party may terminate the contract for breach by the other party, Section 8.2 of the Third Investment Contract states that Plaintiff's sole remedy (including for breach by Venulum) is to take delivery of the wine that, after assessment of mark-ups and other costs, may be worth a fraction of what the Plaintiff invested, which the Plaintiff would be unable to liquidate himself.

171.    Venulum is permitted to retain its fees and mark-ups in the event it breaches the Contract.

172.    The terms of the Third Investment Contract are so one-sided that, as a matter of law, it is unconscionable on its face.

173.    The Third Investment Contract is drafted in a manner that is intentionally confusing to a layman and obscures the true costs and opportunities for self-dealing and abuse associated with investing thereunder.

174.    The provision in the Third Investment Contract that obligates the parties to resolve disputes in the British Virgin Islands before a panel of British Virgin Islands arbitrators is a bald attempt to deny the Plaintiff to his rights as a United States citizen to a court of law in connection with securities sold to the Plaintiff in New York.

175.    The enforcement of such arbitration provision would enable the Defendants to avoid all provisions of United States and New York securities laws, and laws and regulations related to brokers.

176.    Moreover, this arbitration provision, if given effect, would work to protect a fraudulent enterprise.

177.    The Third Investment Contract is unconscionable under New York's Uniform Commercial Code Section 2-302.  Under that same Section, the Contract is unenforceable and the Court should strike any unconscionable clause to avoid any unconscionable result.

## COUNT VI
## FRAUD

178.    Plaintiff repeats and realleges as if fully set forth herein each of the allegations contained in paragraphs 1 through 177.

179.     The Defendants had a duty to make a full and complete truthful disclosure to the Plaintiff and to deal in good faith.

180.     As broker dealers, Defendants Cadman, Serrien and Trotter had a duty of fair dealing.

181.     As broker dealers, Defendants Cadman, Serrien and Trotter had a duty to disclose their compensation related to Plaintiff's investment.

182.     As broker dealers, Defendants Cadman, Serrien and Trotter have a fiduciary duty, to Plaintiff implemented by regulations published as of April 6, 2016.

183.     Defendants failed to make disclosures that were material and that, in the context of inducing Plaintiff to enter into the investment contracts, would have materially altered Plaintiff's understanding of the agreement including: (a) sales compensation to Trotter, Cadman and Serrien in connection with inducing the "sale" of the investment contract, (b) the amount of the mark-up charged on wine purchased on Plaintiff's behalf, (c) the source of the wine and whether the wine would be purchased from affiliates at artificial prices or with other kick-backs or undisclosed compensation to Venulum affiliates,  and (d) that the actual value of Plaintiff's wine could be materially less than the purchase price on which management fees are charged.

184.     Material financial terms of the investment arrangement were not disclosed, rendering the representations that the Defendants did make meaningless.

185.     An agency duty arose because the Defendants were in a relationship with the Plaintiff where they were entrusted to honestly carry out transactions on plaintiff's behalf and hold property owned by the Plaintiff, i.e. the physical wine purchased, as an agent of Plaintiff, and carry out the transactions to the best of their ability without self-dealing and in a commercially reasonable manner.

186.     These duties to Plaintiff cannot be disclaimed, as is attempted in Section 7.1 of the Third Investment Contract.

187.     All of the foregoing material omissions, misrepresentations and breaches of duties owed to Plaintiff by Defendants were made with the intent to induce the Plaintiff to invest in securities issued by Venulum, and to take certain actions to advance a fraud, all to the Plaintiff's detriment.

188.     All of the foregoing omissions and misrepresentations were of material facts, and were made with the knowledge that they were false, and with the intent that the Plaintiff would rely on the false misrepresentations.

189.     The Plaintiff relied on each and all of the foregoing misrepresentations when he invested in the Third Investment Contract.

190.     The Plaintiff's reliance thereon was reasonable in the circumstances.

191.     The Plaintiff suffered economic losses and incurred damages as a result of his detrimental reliance on these misrepresentations of fact.

## COUNT VII
## COMMON-LAW FRAUD

192.     The Plaintiff repeats and realleges the allegations in paragraphs 1 through 191 as though fully set forth herein.

193.     The statements made to induce Plaintiff to invest his money with Defendants were knowingly false when made.

194.     The Plaintiff relied on each and all of the foregoing misrepresentations when he entered the Investment Contracts.

195.     The Plaintiff's reliance thereon was reasonable in the circumstances.

196.     The Plaintiff suffered economic losses and incurred damages as a result of his detrimental reliance on these misrepresentations of fact.

## COUNT VIII
## CIVIL CONSPIRACY

197.     The Plaintiff repeats and realleges the allegations in paragraphs 1 through 196 as though fully set forth herein.

198.     As detailed above, the Defendants engaged in corrupt or unlawful combination and/or agreement with each other and continued to act in concert, in the case of Cadman and Trotter, since 1998.

199.     These overt acts were done pursuant to or in furtherance of Defendants' ongoing evasion of securities laws for profit, and to continue to compel the Plaintiff to fund the Investment Contract(s) and other profit because of their unlawful activities.

200.     Among ongoing activities of Defendants Cadman and Trotter were (i) the continued sale of unregistered securities without an exemption from registration (for which they were sanctioned in the SEC Consent Order, the State Consent Orders and the Related Consent Orders), (ii) the ongoing failure to register as broker dealers despite their sale of securities in the United States using telephones and the United States mail, (iii) their ongoing promotion of wine purchasing schemes.

201.     There is a pattern of recidivism among Defendants Cadman, Trotter and Venulum that is evidenced by their entering into a series of  consent orders with numerous Federal and state regulatory authorities, and then continuing to do exactly what they were sanctioned for.

202.     As a direct and proximate result of Defendants' concerted actions, the Plaintiff has suffered material economic losses, damages and emotional distress.

**COUNT IX**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

203.    The Plaintiff repeats and realleges the allegations in paragraphs 1 through 202 as though

fully set forth herein.

204.    Defendants Cadman, Trotter and Serrien's conduct toward the Plaintiff was extreme and

outrageous because they repeatedly called the Plaintiff at his home; ignored the Plaintiff's

request to liquidate his investment in Venulum; threatened the Plaintiff with the loss or

forfeiture of his entire investment, including wines which he supposedly held title to, if

he did not continue to give money to Venulum; and presented the Plaintiff with the Third

Investment Contract without giving the Plaintiff the time or opportunity to review its

terms or negotiate any provision thereof.

205.    As of the date of this Complaint, Plaintiff has no understanding of how, when or if he

will ever receive the return of the $222,480 he has invested with Venulum.

206.    Each of these episodes, individually and cumulatively, directly and immediately caused

the Plaintiff damage in the form of severe emotional distress, leaving him in tears and

afraid for his ability to provide for his family and his retirement.

**REQUEST FOR RELIEF**

WHEREFORE, the Plaintiffs demand judgment against the Defendants as follows:

A.    Awarding Plaintiffs an amount to be proven at trial but not less than $220,000.00,

on Count I and treble damages as provided in the statute;

B.    Awarding Plaintiffs an amount to be proven at trial but not less than $222,480 on

Count II;

C.      Awarding Plaintiffs an amount to be proven at trial but not less than $222,480 on Count III;

D.      Awarding Plaintiffs an amount to be proven at trial but not less than $222,480 on Count IV and punitive damages in an amount to be determined by the Court;

E.      Awarding Plaintiffs an amount to be proven at trial but not less than $222,480 on Count V;

F.      Awarding Plaintiffs an amount to be proven at trial but not less than $222,480 on Count VI and punitive damages in an amount to be determined by the Court;

G.      Awarding Plaintiffs an amount to be proven at trial but not less than $222,480 on Count VII and punitive damages in an amount to be determined by the Court;

H.      Awarding Plaintiffs an amount to be proven at trial but not less than $222,480 on Count VIII and punitive damages in an amount to be determined by the Court;

I.      Awarding Plaintiffs an amount to be proven at trial but not less than $222,480 on Count IX;

J.       Awarding Plaintiffs their attorneys' fees;

K.      Awarding Plaintiffs their costs and disbursements; and

L.      Awarding Plaintiffs such other and further relief as the Court shall deem just and proper.

DATED:      Buffalo, New York
               May 31, 2017

                                        KAVINOKY COOK LLP

                                        By: /s/ David G. Brock
                                        David G. Brock, Esq.
                                        *Attorneys for Plaintiff*
                                        Office and Post Office Address
                                        726 Exchange Street, Suite 800
                                        Buffalo, New York 14210
                                        716-845-6000
                                        dbrock@kavinokycook.com